638 So.2d 1123 (1994)
Marcus PENN, Plaintiff-Appellant,
v.
WAL-MART STORES, INC., Defendant-Appellee.
No. 93-1262.
Court of Appeal of Louisiana, Third Circuit.
June 15, 1994.
*1125 Christopher Alan Edwards, Lafayette, for Marcus Penn.
Frank A. Flynn, Lafayette, for Wal-Mart Stores.
Before LABORDE, KNOLL, SAUNDERS, DECUIR and BERTRAND,[*] JJ.
SAUNDERS, Judge.
In this workers' compensation case, the claimant, Marcus Penn, contends that the hearing officer erred in finding that he was not entitled to temporary total disability benefits from August 20, 1991, through May 13, 1992, and in awarding only $1,500.00 in attorney's fees. We find manifest error in the hearing officer's failure to award workers' compensation benefits from August 20, 1991, through May 13, 1992, and reverse.

FACTS
Penn, a maintenance employee at Wal-Mart Stores, Inc., injured his neck when he tripped over an electrical cord while buffing floors on June 28, 1991. He reported the accident, but he did not seek medical attention until after he left his employment with Wal-Mart on August 20, 1991. Wal-Mart argues that Penn quit his job over a scheduling dispute with his manager. Conversely, Penn contends that he left work because a new work schedule would prevent him from keeping a previously scheduled doctor's appointment.
Between August 21, 1991, and September 17, 1991, Penn was treated by two chiropractors, Drs. Darrel Johnson and Jeffery M. Cohn. Penn's chief complaint was of neck pain which increased with movement. Dr. Johnson's findings included cervical spasm, a reduction in the cervical lordosis, and tenderness on palpation at C3 through T8. He prescribed physical therapy, but when Penn showed only slight improvement after 12 visits, Dr. Johnson referred him to an orthopedic surgeon, Dr. John Humphries.
At his initial evaluation on September 23, 1991, Dr. Humphries noted tenderness in the neck area with mildly limited range of motion, but no spasm. X-rays revealed good vertebral alignment with mild relative narrowing at C5-6. His diagnosis was acute cervical thoracic and lumbar sprain, with degenerative disc disease at C5-6. An essentially normal neurological exam led Dr. Humphries to conclude that there was only a low suspicion of a herniated disc. At this visit, Dr. Humphries prescribed pain pills, muscle relaxants and physical therapy.
At a follow-up visit on October 14, 1991, Dr. Humphries noted that the claimant reported no relief from physical therapy. Dr. Humphries ordered an MRI and added cervical traction to Penn's neck treatment. At the next visit on November 18, 1991, Dr. Humphries reviewed the results of the MRI which showed degenerative disc disease at C5-6, but no herniation. Penn reported that his pain increased; Dr. Humphries' response was to step up his physical therapy. Dr. Humphries believed that Penn was capable of performing light to moderate work. When Penn reported no improvement at the next visit, Dr. Humphries referred him to a neurosurgeon, Dr. Daniel Hodges.
Dr. Hodges saw Penn on two occasions, January 13, 1992, and February 18, 1992. He noted limited range of motion, but no spasm. He prescribed physical therapy and medications and also ordered a CT scan, which was performed on January 23, 1992. The CT scan revealed a small focal disc herniation at C5-6. This finding, plus Penn's *1126 report of only slight improvement, prompted Dr. Hodges to refer him to Dr. Robert Rivet, another neurosurgeon.
Penn first saw Dr. Rivet on March 9, 1992. At this visit, Dr. Rivet recommended that Penn undergo a myelogram and CT scan, based upon symptoms that he felt were compatible with radiculopothy and were conformed by the abnormal MRI and CT scans taken previously. These further diagnostic aids were performed on May 13, 1992, revealing a C5-6 protrusion on the right side that abutted the ventral aspect of the spinal cord. Dr. Rivet believed these findings and Penn's complaints of pain warranted surgical intervention. Dr. Thomas Flynn, a neurosurgeon who saw Penn at defendant's request, concurred in this recommendation, although another defense expert, Dr. James Domingue, did not. On September 15, 1992, Dr. Rivet performed an anterior fusion and discectomy at C5-6.
Although Dr. Rivet initially reported that the fusion had healed well, Penn was referred to yet another neurosurgeon, Dr. John Jackson, when his neck pain did not improve postoperatively. In his report dated February 15, 1993, Dr. Jackson indicated that the bone implant on the fusion may not have fused completely, but that it would be another four months before he would know if the fusion was solid. This report is the most recent medical information in the record.
Wal-Mart began paying Penn temporary total disability benefits on July 13, 1992, retroactive through May 13, 1992, the date of the diagnostic testing that prompted Dr. Rivet's recommendation of surgery. Wal-Mart also paid all of Penn's medical expenses, apparently in a timely manner. By stipulation at trial, the question of disability was limited to whether Penn was entitled to temporary total benefits from the date he left his job, August 20, 1991, through the date defendant began paying benefits, May 13, 1992. The other issues at trial were whether benefits were being paid at the correct rate and whether Penn was entitled to penalties and attorney's fees.
The hearing officer ruled against Penn on the issue of past disability, finding that he failed to prove entitlement to temporary total benefits during the dates in question. However, the hearing officer did find that the defendant had been paying benefits in an incorrect amount since May 13, 1992, and further that defendant was arbitrary and capricious in refusing to correct this error. For this omission, the hearing officer awarded the claimant $1,500.00 in attorney's fees, plus penalties. The hearing officer also awarded penalties on any unpaid mileage reimbursement that was owed to Penn. Penn appeals.
Wal-Mart has not appealed and the determination of the hearing officer as to Penn's compensation rate is therefore final.

DISCUSSION
Penn first argues that the hearing officer erred in denying his request for past disability benefits. We agree.
Effective January 1, 1990, a claimant must prove by "clear and convincing" evidence that he is physically unable to engage in any employment or self-employment before an award for temporary total disability benefits can be made. LSA-R.S. 23:1221(1)(c). This amendment imposes a heightened burden of proof on the claimant. Rosella v. DeDe's Wholesale Florist, 607 So.2d 1055 (La.App. 3d Cir.1992). A trial court's finding of disability is a factual question that should not be overturned on appeal absent an abuse of discretion.
For purposes of our review, we note three significant dates in the record: June 28, 1991, the date the employee was injured; August 20, 1991, the date the employee quit work; and May 13, 1992, the date that a myelogram and CT scan revealed a C5-6 protrusion on the right side that abutted the ventral aspect of the spinal cord. Dr. Rivet, who had these tests performed, believed that these findings and Penn's complaints of pain warranted surgical intervention. This conclusion was concurred in by Dr. Thomas Flynn, a neurosurgeon who saw Penn at the defendant's request. Surgery was subsequently performed.
Defendant, after receiving these conclusions, recognized that plaintiff was entitled to *1127 compensation benefits and paid compensation retroactive to May 13, 1992. Defendant continued to pay workers' compensation from that date, although at a slightly miscalculated rate, and also paid the plaintiff's medicals. The defendant did not pay compensation for the period of August 20, 1991, through May 13, 1992, apparently taking the position that workers' compensation was due from the date that the diagnostic testing revealed conclusively that the plaintiff was in need of an anterior fusion and discectomy at C5-6.
An insurer or an employer is required to make a reasonable effort to ascertain an employee's exact medical condition before benefits are terminated or denied. Duplechain v. Gulf States Utility Co., 468 So.2d 1386 (La.App. 3d Cir.1985). This obligation is continuing in nature. Thus, if subsequent to an initial optimistic report, an insurer receives medical information indisputedly showing disability at a particular date, the insurer may not blindly rely upon the earlier report and solely on its basis avoid penalties for arbitrary nonpayment of compensation benefits. Slate v. Travelers Ins. Co., 556 So.2d 903, 906 (La.App. 3d Cir.1990); Johnson v. Ins. Co. of N. America, 454 So.2d 1113 (La.1984).
There is nothing in the record to suggest that the plaintiff's condition was any worse after this diagnosis was made than it was before or, indeed, to suggest that his condition changed in any respect on May 13, 1992, the date that the nature of his injury was diagnosed. Entitlement to compensation commenced August 20, 1991, and it is clear from the record that the defendant was aware of this as of May 13, 1992.
Given the above determinations, the question remains whether claimant is entitled to additional attorney's fees and statutory penalties. The 1983 amendment to the Worker's Compensation Act requires different standards to be applied to each. Refusal of any employer or insurer to make payments of workers' compensation benefits for claims properly made, when such refusal is found to be arbitrary, capricious or without probable cause, subjects the employer or insurer to payment of reasonable attorney fees. LSA-R.S. 23:1201, et seq. Theriot v. American Employees Ins. Co., 482 So.2d 648 (La. App. 3d Cir.1986).
On the other hand, penalties will be assessed unless the employee's right to such benefits has been reasonably controverted. The test to determine whether the employee's right has been reasonably controverted turns on whether the employer or his insurer had sufficient factual and medical information to reasonably counter the factual and medical information presented by the claimant. LSA-R.S. 1201.2. Hopes v. Domtar Industries, 627 So.2d 676, 687 (La.App. 3d Cir. 1993).
In the present case, the employee's right to compensation was reasonably controverted prior to May 13, 1992, the date that the myelogram and CT scan revealed a C5-6 protrusion on the right side that abutted the ventral aspect of the spinal cord. After this date, however, there was no reasonable controversy as the plaintiff has shown by objective evidence that he was entitled to compensation. In view of this evidence, the failure to pay compensation retroactive to August 20, 1991, the date the employee quit work, cannot be said to be reasonably controverted as nothing in the record suggests that the plaintiff's condition was changed on May 13, 1992, the date that plaintiff's injury was diagnosed. An employer who deprives its injured worker the medical expenses necessary to ascertain his medical condition, as opposed to medical expenses incurred for purposes of litigation, cannot use the denial to escape sanctions. Orgeron v. Tri-State Road Boring, Inc., 434 So.2d 65 (La.1983); Bailey v. Smelser Oil & Gas, Inc., 620 So.2d 277 (La.1993). cf. Chevalier v. L.H. Bossier, Inc., 617 So.2d 1278 (La.App. 3d Cir.1993) (litigation purposes).
We have already observed defendant's failure to support its continued denial of benefits on the basis of a stale and subsequently disproven medical diagnosis. Under these circumstances, the position of defendant became unreasonable and it cannot be said that there was a reasonable basis for controverting the claimant's entitlement to disability benefits from the date of his injury. *1128 By the same token, since there is no reasonable controversy as to the claimant's entitlement to benefits, the failure by the defendant to make payments subsequent to May 13, 1992, for the period in dispute, was arbitrary and capricious and entitles the plaintiff to penalties and reasonable attorney fees. The hearing officer awarded plaintiff $1,500.00 as attorney's fees for defendant's miscalculation of benefits and refusal to correct this error and for defendant's failure to pay mileage expenses. We will amend this amount and award plaintiff an additional $6,000.00 for all work performed by plaintiff's attorneys at the hearing level and on appeal for a total of $7,500.00. We feel this amount is fair and reasonable and supported by the record.
The defendant alleges that the hearing officer was justified in determining that the claimant was not disabled prior to May 13, 1992, as Dr. Humphries on two occasions, October 14, 1991, and November 18, 1991, stated that Penn could perform light to moderate work. However, Dr. Humphries continued to see the claimant and eventually referred him to Dr. Rivet and Dr. Hodges, which led to the finding of the need for surgery. Dr. Humphries, at the time he indicated the claimant could do light work, did not know that the claimant was in need of a discogram and a fusion. This lack of information clearly invalidates Dr. Humphries' opinion that the claimant was capable of work. Dr. Humphries at no time subsequent to the discogram asserted that the claimant was able to perform even light work.
Accordingly, we reverse the finding of the hearing officer and we award compensation for the period of time in dispute, August 20, 1991, to May 13, 1992. We also award statutory penalties of twelve (12%) percent on all past due benefits and attorney's fees in an additional amount of $6,000.00 for a total of $7,500.00 for the work performed at the hearing level and on appeal.
Penn also complains that the judgment appealed from does not contain a finding that he was disabled as of the date of trial. However, the record clearly shows that only Penn's past disability, by stipulation of the parties, was at issue before the hearing officer. We find no merit to this argument.

DECREE
The decision of the hearing officer denying plaintiff compensation benefits for the period in dispute is reversed and plaintiff, Marcus Penn, is awarded temporary total disability benefits for the period of August 20, 1991, through May 13, 1992, together with legal interest from date of judicial demand until paid on all past due benefits. The decision of the hearing officer is amended and plaintiff is awarded additional attorney's fees in the amount of $6,000.00 for a total of $7,500.00 for all work performed by plaintiff's attorneys at the hearing level and on appeal and statutory penalties of twelve (12%) percent on all unpaid compensation benefits. The remainder of the judgment of the hearing officer is affirmed.
Defendant, Wal-Mart Stores, Inc., is assessed with all costs at the hearing level and on appeal.
AFFIRMED IN PART, AMENDED IN PART, REVERSED IN PART AND RENDERED.
BERTRAND, J., dissents and assigns reasons.
KNOLL, J., dissents for reasons assigned by BERTRAND, J.
BERTRAND, Judge, dissenting.
The hearing officer found that Penn failed to prove total disability from the date he quit his job through May 13, 1992, the date the diagnostic testing revealed a C5-6 protrusion abutting the spinal cord and the date that defendants began paying compensation benefits. Implicit in this conclusion is a finding that Penn's condition worsened over time. Applying the manifest error standard of review, I find ample evidence to support the hearing officer's decision, including Penn's complaints of worsening pain, the results of earlier diagnostic testing indicating only degeneration with no herniation, and, most significantly, the failure of any physician to state that Penn was totally disabled prior to his surgery.
Four and a half months after the accident, Dr. Humphries, Penn's treating physician, *1129 recorded, "Mr. Penn states that he is hurting worse and worse." The first MRI, of October 16, 1991, revealed only degenerative changes and a mild bulge, with no herniation. After reviewing this test, Dr. Humphries still maintained, "I do not think this man has anything serious wrong with him." Dr. Humphries consistently maintained that Penn could perform light to moderate work.
The reports of Dr. Thomas Flynn provide the most convincing evidence that the diagnostic testing of May 13, 1992 documents a change in Penn's condition. Dr. Flynn first reviewed the earlier diagnostic testing and concluded that there was no evidence of a structural problem that would produce on-going symptoms. However, after reviewing the testing of May 13, 1992 he completely changed his opinion and found that the protrusion at C5-6 was significant enough to warrant surgery.
Even after the test results of May 13, 1992, indicated that surgery was appropriate, Dr. Rivet still did not place any specific restrictions on Penn's activities. In his deposition, Dr. Rivet testified as follows:
Q: [By Mr. Edwards] I'll reform my question. Since the time you saw Mr. Penn in March of 1992 through I guess today's date or since the last time you saw him, and let's just say he's having the same problems now he's having the same problems now as when you saw him in Marchwhat limitations would you place upon him until he has surgery?
A: I wouldn't place any. I would tell him to do anything he felt capable of doing. Certainly I don't think doing anything real strenuous; but if he felt that he had to do it to earn his living, then I would tell him I would have no objection to it.
Q: Would he be limited by the amount of pain, for example that he's in?
A: Certainly.
Q: Would you, Doctor, in the normal course of events expect that a condition such as Mr. Penn has requiring surgery would cause pain?
A: It can. Yes, sir.
* * * * * *
Q: [By Mr. Flynn] Likewise Dr. Humphries saw the patient on numerous occasions before March of '92, and he has opinions with reference to Mr. Penn's ability to do sedentary to light-duty, moderate-duty type activities. You would defer to Dr. Humphries in reference
A: Yes, sir.
Q: to the ability to work?
A: Yes, sir.
Q: And you yourself have not specifically placed any work restrictions on Mr. Penn other than just simply saying do what you can do?
A: That's correct.
Q: And that would hold true through the entire course of your treatment up until today?
A: Yes, sir.
Dr. Rivet did testify that Penn's activities would be limited by the amount of his pain. However, whether Penn's pain became disabling prior to May 13, 1992 is a question of fact that rests entirely within the trial court's province. Evidence in the record as to Penn's credibility include the fact that he continued to work for two months after the accident without any medical treatment and testimony that he left his job for reasons unrelated to the accident.
After viewing the record in its entirety, I find no reason to disturb the hearing officer's conclusions and credibility evaluations. I would therefore affirm the judgment below in all respects.
NOTES
[*] Honorable Lucien C. Bertrand, Jr., Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.