| THIBODEAUX, Judge.
Willis Thomas appeals a judgment from the Office of Workers’ Compensation denying him compensation benefits, penalties, and attorney fees. Thomas, a patrolman for the Town of Arnaudville Police Department, was injured in an unwitnessed, one-car accident that occurred while he was on duty and in pursuit of a speeding vehicle. We conclude that the workers’ compensation judge committed manifest error in finding the claimant had not proven by a preponderance of the ^evidence that a compensable, work-related accident occurred. We find the denial of penalties and attorney fees to be manifestly erroneous, as well. Therefore, we reverse the judgment of the Office of Workers’ Compensation, remand the case for a determination of compensation benefits and penalties to be awarded, and award attorney fees in the amount of $7,500.00.
I.

ISSUES

The issues pertinent to the resolution of this appeal are:
1. whether the workers’ compensation judge committed manifest error in finding that Thomas failed to prove that a work-related accident occurred; and,
2. whether the judge erred in failing to find the employer and insurer were arbitrary and capricious in the denial of workers’ compensation benefits.
II.

FACTS

On December 31, 1994, Thomas was parked in his patrol ear on Market Street in Arnaudville conducting radar work sometime after 11:00 p.m., when he noticed a brown pick-up truck speeding at greater than sixty miles per hour in a forty miles per hour zone. Thomas called the dispatcher and stated that he was in pursuit of a speeding vehicle and was able to give the letter “T” as the first letter of the vehicle’s license plate number. According to Thomas, he followed the vehicle outside of the city limits onto Parish Road 3-65. While traveling at a high rate of speed, he claims to have crossed raised railroad tracks which caused his patrol car to leave the ground and the bumper to roughly scrape the pavement upon landing. As the car was descending over the tracks, he noticed that the truck was parked on the bright side of the road, perhaps ten feet or more ahead, and its headlights had been turned off. Thomas contends that the truck suddenly pulled in front of his vehicle onto the road, causing him to slam on his brakes. He stated the. patrol car began “whipping,” he lost control, and landed in a ditch adjacent to the road.
Although Thomas denies being able to remember the next sequence of events, the dispatcher’s radio log shows an entry of a call received from him at 11:20 p.m. stating that he had been in pursuit of a brown Chevrolet pick-up truck on Parish Road 3-65 and had lost control of the vehicle. Thomas was found unconscious at the scene by the Chief of Police, Mr. Guidroz, and Officer Arnaud of the Arnaudville Police Department. The car was drivable after the accident, having sustained only a dent in the front bumper, a damaged steering shift, and a bent steering wheel.
Thomas was transported by ambulance to Opelousas General Hospital where he was evaluated. He sustained a one inch contusion on the forehead and a cut on his right hand. Records from Acadian Ambulance Service, Inc. documented that Thomas was awake and disoriented when the paramedics arrived and that he complained of pelvic, abdominal, neck and back pain and paralysis in the legs. At the hospital, Thomas continued to complain of aches and pains all over his body, especially in his neck, middle and lower back, and abdomen, and also said he could not feel or move his legs.
On January 1, 1995, he was transferred to Our Lady of Lourdes Hospital for a neuro *550 logical evaluation and was seen by neurosurgeon, Dr. Patrick Juneau, III. Dr. Juneau took x-rays of the head and neck but did not detect any abnormalities. Motor sensory reflexes in the arms were normal, but abnormal in the legs because he had no volitional movement in any motor group in the lower extremities. The patient also showed diminished reactions to pinprick and light sensory touch tests. However, |4when Dr. Juneau raised each leg to forty-five degrees, the patient would suspend his leg in the air for a few seconds before dropping it, thus exhibiting a sign that there was no paralysis in the legs from an organic standpoint. The patient was unaware that he was doing this. The doctor found that the motor tone in his legs was normal and he also displayed a positive Hoover’s sign in both legs. Hoover’s sign is the reaction that is apparent when one leg is raised and the opposite heel is pressed down by the patient to support the raised leg; paraplegics cannot do this. Dr. Juneau documented this as a finding that was consistent with a non-organic paralysis.
Dr. Juneau further diagnosed the patient as not showing any signs of spinal cord pressure. He found the patient to have good rectal tone and a positive bulbocavernosus reflex revealing that the sphincter of the rectum was intact. These findings would not be found in a patient with spinal shock. Dr. Juneau stated that his findings as a result of that initial exam did not result in anything that would substantiate a true anatomic basis for paralysis. Dr. Juneau’s impression was that Thomas’s exam was most consistent with a functional or hysterical paraplegia, a paralysis that is psychologically based. Therefore, he decided to admit Thomas for supportive care.
Thomas remained in the hospital for fourteen days and was seen by numerous doctors who were asked to consult by Dr. Juneau. Dr. Daniel Dunlap, a medical neurologist, examined Thomas on January 1, 1995, reviewed the patient’s test results, and agreed with Dr. Juneau’s finding that there was strong evidence of a functional or hysterical paraplegia. Dr. Dunlap also believed Thomas suffered muscle strains all over, especially in the neck and back. He agreed with Dr. Juneau’s plan to treat him symptomatically, to start physical therapy, and to gradually increase that. He prescribed Elavil and Norgesic Forte.
On January 3, 1995, Thomas was still not moving his legs and continued to state that he could not feel anything in them. Dr. Juneau noted that the patient continued, however, to display Hoover’s sign and that the physical therapist had also documented the fact that he could hold his leg up off the bed. Somatosensory evoke potentials were done of the lower extremities, and a thoracic lumbar MRI was recommended at this time, as well as a psychiatric consult with Dr. David Dawes.
Dr. Dawes’ consultation report of January 4, 1995, assessed Thomas as possessing a conversion disorder which he believed explained the paralysis of the legs with no neurologic or medical explanation. Dr. Dawes defined “conversion disorder” as the more common name for hysterical paraplegia which exists when a patient displays a neurological deficit such as blindness, inability to speak, paralysis, or other symptoms that are not explained by physiological or medical reasons. The patient- displays these symptoms because of some unconscious conflict that has come about in the context of a major stressor in the patient’s life or in an effort to resolve an unconscious conflict. Dr. Dawes believed the cause of the conversion disorder in this case was severe fear and shock from the accident because Thomas stated that, just before the accident, he feared he might die and also expressed concern about a prior accident involving a patrolman in which persons being pursued ultimately died. Dr. Dawes recommended a brief rehab stay with supportive care and occupational and physical therapy until the conversion problems resolved.
Dr. Juneau also visited the patient on January 4th and made a progress report notation that there was now adequate documentation of a hysterical paraplegia (conversion disorder) as the appropriate diagnosis because the somatosensory evokes were normal. Moreover, the MRI of the thoracolum-bar spine showed no evidence of cord compression or acute findings.
*551 Dr. Dunlap visited the patient again on January 5th, and noted in the patient’s progress record that Thomas opened his eyes when he touched his foot and that the quadriceps were working when he raised Thomas’ leg. Dr. Robert White, of Rehabilitation Medicine, examined the patient on- that date as well, and agreed with the diagnosis of a conversion disorder and also recommended inpatient rehabilitation with close psychiatric follow-up by Dr. Dawes, neurology follow-up by Dr. Dunlap and remote follow-up by Dr. Juneau. He also noted that because the workers’ compensation carrier had denied a previous request for rehabilitation, he would attempt to contact the agency again for approval.
There were no changes in Thomas’ condition over the next few days. However, on January 10th, Dr. Dawes began to entertain the possibility that Thomas was malingering. He began to consider this diagnosis after speaking with Dr. Benoit, a psychologist he asked to evaluate Thomas for recommendations on possible hypnosis or other suitable treatments to resolve the conversion disorder. Dr. Benoit stated that on January 9th and 10th, he examined the patient, and attempted to reduce his anxiety and apprehensiveness and to assess his responsiveness to hypnosis. Dr. Benoit stated that the patient seemed concerned about revealing information to him, so he reassured Thomas that he would be in control the entire time and that he would not be asleep or under anyone else’s control. He also assured him that he would not ask him any questions about himself or the accident. Nevertheless, Thomas stated that he would not agree to the procedure until he had spoken to his attorney and his wife.
The following day, Dr. Benoit arrived at the patient’s room to find him conversing with his attorney on the telephone. Thomas gave the phone to Dr. Benoit, who proceeded to explain his plan for treatment, which included hypnosis and 17administering the Minnesota Multi-Phasing Personality Inventory (MMPI). He believed the MMPI would allow him to complete his psychological evaluation of the patient because it gives personality and acute emotional characteristics, contains profiles related to conversion disorders, and validity scales regarding malingering, exaggeration of symptoms, minimization of symptoms, or the degree to which an individual is accurately reporting their symptoms. The hypnosis was being considered because of the known cases in which conversion paralysis has spontaneously remitted under hypnosis. Also, it could possibly uncover unconscious factors related to the condition that could not be assessed through talking with the patient.
Thomas’ attorney wanted to talk more with his client before a decision was made. The next day, the attorney phoned Dr. Benoit and stated that Thomas had agreed to the hypnotherapy and the MMPI; however, when Dr. Benoit spoke with Thomas again, he refused to proceed. Dr. Benoit discontinued treatment at that point because he felt Thomas was being uncooperative, guarded, and evasive. He believed that there may have been a conversion disorder, but believed it was important to rule out malingering, given the rápidity with which he felt a medi-colegal context had been created.
Thomas was evaluated again on January 11th by Drs. Juneau, Dawes, and White. Notations in the progress record reveal that there was improvement in the somatosensory exam and that Thomas was now stating that he had some sensation in the legs, although he still denied being able to walk. There were also notations from other doctors that the patient was standing during physical therapy using a walker. Dr. Dawes was in favor of discharging Thomas at this point, but the doctors decided |gto seek a second psychological opinion regarding the malingering versus the existence of a conversion disorder.
On January 12th, Dr. White was successful in having Thomas extend his knee to lift his leg to kick his hand while encouraging him and talking him through it. The following day, the patient stated that he had feeling under both feet, began moving his toes, and walked using a rolling walker. Dr. Juneau, who had spoken periodically with Thomas’ attorney, advised him of the progress. The attorney requested a second opinion, but Thomas was discharged on January 14th, *552 with a walker, after showing a “dramatic” improvement in walking.
Risk Management, Inc. (RMI), the servicing agents for the Town of Arnaudville, never approved medical benefits to cover rehabilitation costs for Thomas and ultimately denied his claim for compensation benefits on March 29, 1995. In a letter from claim representative Veron White, Thomas was informed that his claim had been denied based on their investigation which concluded that there was insufficient evidence to warrant eligibility for, benefits.
The investigation conducted by RMI included surveillance of Thomas on March 13, 15, and 17, 1995, during which time he was observed walking, standing erect, carrying a basket of clothes, bending at the waist, and entering and exiting his residence without any signs of pain or discomfort. RMI contends that Thomas’ movements did not appear restricted, and he was not observed using an aid or wearing a brace. The general manager for RMI, Earl Cronin, also testified at the hearing that the claim was denied because of the total findings drawn from the photographs of the automobile, the description of the accident, the medical records and the utilization review that was completed by the company’s nurse/utilization 19review specialist. Mr. Cronin stated that RMI felt the claim should have been denied because the injuries that were claimed were inconsistent with their findings.
In the same month that Thomas learned he was being denied compensation benefits, he was able to gain employment as a security guard at a casino/truck stop, working eighty-four hours every two weeks at $4.90 per hour. Thomas maintained this position until June 1995 when he began complaining of pain in his back, legs, and feet as a result of standing for long hours. His employer, Security Management Group, allowed him to remain home until it was able to find less demanding work for him. He was placed in a security position at a hospital, and jgwas only required to work sixty-five hours per two-week period. The job also did not require the long hours of standing and walking.
Although Thomas urges that he continued to experience pain after being discharged from the hospital, and that he had to request a less demanding position as a security guard because of this pain, Thomas did not see a doctor until June 22, 1995, when he began to receive treatment from Dr. Michel Heard, an orthopaedic surgeon. He stated that he had been unable to follow-up with Dr. Juneau because the visit had not been approved by his carrier and he could not afford to pay for the office visits. Until he began to undergo treatment with Dr. Heard, Thomas claims to have self-treated his neck and back pain by taking almost a bottle of over-the-counter pain relievers daily. He also complained of having experienced periodic numbness in the legs and problems performing sexually during that time.
Dr. Heard performed many of the tests previously conducted by the doctors at Our Lady of Lourdes Hospital, but concluded his examination with the impression that Thomas suffered from post-traumatic multiple trauma with persistent headaches, neck, low back pain, and sexual dysfunction in the form of difficulties | ipwith penile erections. At the hearing, Thomas’ wife corroborated her husband’s allegations of the existence of pain and problems performing sexually. These problems did not exist before the accident. Dr. Heard prescribed pain medications over the course of the visits with Thomas and continuously referred him to Dr. Charles Williams for a sexual medicine evaluation. Thomas was never examined by Dr. Williams, however, because he could not afford to pay for the office visit.
It was not until July 25, 1995 that Dr. Heard approved Thomas for light and sedentary activities as could be tolerated. Upon receiving this doctor’s release, Thomas presented it to the new police chief of Arnaud-ville, Mr. Duplechain, and requested a return to the job, but was told he could not return while taking medication because of concern about another accident. On November 11, 1995, Dr. Heard approved Thomas for regular duty work. Once again, Thomas inquired with Duplechain and Mayor Lenard Meche about resuming his position on the police force, but was unsuccessful. On December 20, 1995, a disputed claim for compensation *553 was filed on behalf of Thomas with the Office of Workers’ Compensation.
Thomas returned to Dr. Heard and complained of increased and constant pain in the neck and low back in January, 1996. Dr. Heard found him to be very tender in the paracervical area and gave a Celestone and Marcaine block and prescribed 800 mg of Motrin to be taken once daily. Dr. Heard revoked his previous approval for regular duty work and recommended that Thomas perform only light and sedentary activities as tolerated. The last reported medical visit to Dr. Heard contained in the record shows that Thomas was continuing to receive treatment for pain in June, 1996.
| nThe hearing before the workers’ compensation judge was held on July 22, 1996, and the judgment and written reasons for judgment were signed on March 19, 1997. Thomas perfected this appeal on May 12, 1997.
III.

LAW AND DISCUSSION

Workers’ Compensation Benefits
The issues we are asked to resolve are whether Thomas satisfied his burden of proving that a work-related accident occurred and whether he was injured as a result of that accident. Thomas argues that there is nothing to contradict that he was injured in a work-related accident. He states that he was found unconscious in his patrol car suffering from physical injuries, and that there also was damage to the car as a result of the accident. In addition, he contends that the medical evidence introduced at the trial clearly established that he suffered from a conversion disorder which lasted for fourteen days. The later suspicion that arose regarding malingering, he also argues, was never substantiated and only came about after the doctors became aware that he was consulting an attorney and became frustrated by his refusal to undergo hypnotherapy and to take the MMPI.
The Town of Arnaudville argues that the judgment of the Office of Workers’ Compensation was correct because Thomas was unsuccessful in proving that an accident occurred. It contends that circumstances following the alleged accident, in the form of pictures of the accident scene, the patrol car, medical records of injuries sustained by Thomas, and the opinions of the treating physicians, failed to corroborate Thomas’ testimony. In addition, it alleges that Thomas orchestrated the incident in order to reap the economic benefits of workers’ compensation because he feared losing his job in the near future. Allegedly, this was because Thomas knew |i2he had not obtained a high school or a high school equivalency diploma that patrolmen are required to have, and he feared the newly elected police chief, Duplechain, whom he had not supported and had participated in an investigation of voter fraud against, would terminate him when he took office on January 1st.
The workers’ compensation judge stated that the claimant failed to meet his burden as enunciated in Bruno v. Harbert Int’l, Inc., 598 So.2d 357 (La.1992). The supreme court in Bruno wrote:
[T]he plaintiff-worker in a compensation action has the burden of establishing a work-related accident by a preponderance of the evidence. A worker’s testimony may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker’s version of the incident; and (2) the worker’s testimony is corroborated by the circumstances following the alleged accident. Corroboration of the worker’s testimony may be provided by the testimony of fellow workers, spouses or friends. Corroboration may also be provided by medical evidence.
Id. at 361 (emphasis added) (citations omitted).
In connection with this language, the judge stated that the “evidence presented at trial casts serious doubt upon the claimant’s version of the December 31, 1996 accident. In addition, the circumstances following the alleged incident did not corroborate the testimony given at trial.”
*554 We gave consideration to the record as a whole to ascertain whether the findings of the workers’ compensation judge constituted manifest error. See Bruno, 593 So.2d 357; Alexander v. Pellerin Marble & Granite, 93-1698 (La.1/14/94); 630 So.2d 706; Henderson v. Pavy, 96-90 (La.App. 3 Cir. 3/15/96); 688 So.2d 1048 (citing Freeman v. Poulan/Weed Eater, 93-1530, (La.1/14/94); 630 So.2d 733). We conclude that the record does not provide a reasonable factual basis for the finding that a work-related accident did not occur, and we find that the workers’ compensation judge was clearly wrong. See Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993).
A claimant in a compensation action must first establish “personal injury by accident arising out of and in the course of his employment.” La.R.S. 23:1031. “Accident,” for workers’ compensation purposes, has been defined by La.R.S. 23:1021(1) as the “unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.” In workers’ compensation actions, the question of whether a work-related accident occurred has been consistently viewed from the workers’ perspective by Louisiana courts, and the work-related accident requirement has also been regularly given a liberal interpretation by Louisiana courts. Bruno, 593 So.2d 357 (citing Williams v. Regional Transit Authority, 546 So.2d 150 (La.1989)). In accord with this trend, our supreme court has stated that when evaluating the evidence in a workers’ compensation suit, the uncontradicted testimony of a witness is to be accepted as true, even if the witness is a party, unless there exist “circumstances in the record casting suspicion on the reliability of this testimony.” West v. Bayou Vista Manor, Inc., 371 So.2d 1146, 1147 (La.1979). See also Aymond v. R.J. Jones & Sons, 96-443, p. 6 (La.App. 3 Cir. 11/20/96); 690 So.2d 769, 773; Bruno, 593 So.2d at 361.
In West and Bruno, the Louisiana Supreme Court reversed lower courts which found that claimants had not proven that an unwitnessed, work-related accident occurred. The supreme court analyzed the factors relied upon by those lower courts as casting doubt on the reliability of the workers’ compensation claimants’ testimony, and explained why those factors were insufficient to discredit the plaintiffs’ uncontradicted testimony. Because we find the principle set forth in those cases dispositive here, we too will analyze the factors relied upon by the workers’ lucompensatiom judge as casting doubt on Thomas’ testimony and the reasons why these factors are insufficient to reject his version of events.
The workers’ compensation judge first supports his finding that a work-related accident had not been proven by a preponderance of the evidence, by stating that the photographs of the accident scene, the lack of any major body damage having been sustained by the car, and the testimony of Chief Guidroz warrant the conclusion that the patrol car was not traveling at a high rate of speed before coming to rest. We do not believe the rate of speed the car was traveling to be dispositive of whether it could have been involved in an accident. Further, the workers’ compensation judge was premature and presumptuous in his conclusion regarding the rate of speed the patrol car was traveling. The record does not contain any determination of how fast Thomas was driving before landing in the ditch, and it is also void of any facts or expert testimony which concludes that the car could not have been traveling at a high rate of speed before it landed in the ditch. Therefore, we believe this finding fails to cast any serious doubt on Thomas’ version of events.
In addition, .our review of the record reveals evidence to corroborate Thomas’ assertion that an accident occurred as he described. The Arnaudville Police Department log that was maintained by the dispatcher, Martha Taylor, reflects that on December 31, 1994, Thomas called in a 10-6 at 11:19 p.m. stating that he was in pursuit of a vehicle on LA 31 North, and giving the license plate letter “T.” She also documented in the log, another call at 11:20 p.m. received from Thomas in a weak voice, in which he said that he had lost control of the car while in pursuit of a brown Chevrolet pick-up truck on Parish *555 Road 3-65. Ms. Taylor testified that when she attempted to reply immediately thereafter, Thomas was unresponsive. Officer Ar-naud, on duty at the time, also testified to hearing these calls over the radio. | isAdditionally, the record revealed testimony from Officer Arnaud attesting that he and Chief Guidroz found Thomas at the scene in an unconscious state in the wrecked patrol car. Based on this corroborating testimony, the condition in which Thomas was found, the damage sustained by the vehicle, and the location of the vehicle when found, we must conclude that the testimony of Thomas is true, and that an accident occurred as he described.
Having found that a work-related accident occurred, we must now determine whether compensable injuries were suffered by the claimant. The judge reasoned that the photograph of the steering wheel, which showed drastic deformation, failed to cause any recorded medical bodily injury to the claimant that would have been caused by contact with the steering wheel. He stated further that the medical evidence failed to ever reveal any evidence of paralysis from an organic standpoint, and that although initially the doctors believed the patient to have been suffering from a conversion disorder, the final assessment was that the patient was a malingerer.
We find that the record does support the existence of physical and non-physical injuries as a result of the accident. First, we will address the error committed by the workers’ compensation judge in failing to recognize the existence of a non-physical injury in the form of a conversion disorder. The record contains Dr. Juneau’s discharge summary which includes an admitting and final diagnosis of hysterical paraplegia (conversion disorder). The discharge summary contains the following language:
Impression was that this patient most likely had a hysterical paraplegia. He was seen by Dr. Dan Dunlap of neurology who agreed with this diagnosis.
He was seen by Dr. Robert White of Rehab Medicine who thought he was a good candidate for Rehab. He was also seen by 116Pr. Dawes of psychiatry who confirmed this diagnosis as well, i.e., that of a hysterical or conversion paraplegia.
In addition, the consultation reports written by the doctors mentioned above all indicate a diagnosis of conversion disorder. Although there was no organic evidence of paralysis apparent from the numerous tests done, this is of no consequence because the disorder is understood to result in symptoms that have no apparent organic or physical cause. Moreover, although Dr. Dawes testified in his deposition that he believed malingering was more likely than a conversion disorder, he admitted that he could not make a final definitive diagnosis. Dr. Benoit, the psychologist who also made the claim that malingering was probable, was deposed and also stated that his’ opinion was based on limited information, as he had been unable to fully evaluate the patient. As a result of this information, we find that the workers’ compensation judge erred in finding that Thomas was a malingerer and did not suffer from a non-physical injury in the form of a conversion disorder.
We also find that the workers’ compensation judge failed to recognize the physical injuries suffered by Thomas as a result of the accident. There is evidence in the record to reflect that Thomas suffered injuries in the form of muscle strains in various areas of the body. Dr. Dunlap stated in his consultation report dated January 1st, “I didn’t get him out of bed. I believe he has a Bardex. There is strong evidence that this is functional paraplegia. I think he must have strained muscles all over, especially in his neck and back and he has some aches and pains.” Dr. Juneau also stated in his deposition that Thomas experienced low back pain during his stay at the hospital, which he attributed to muscle ligamentous strain. In addition, Dr. Heard, the orthopaedic surgeon who treated Thomas from June 1995 through June 1996, wrote in a June 20, 1995 narrative report that his impression was that Thomas suffered from post-traumatic multiple trauma with persistent headaches, neck pain, h7and low back pain. Consequently, he treated Thomas for constant pain in the neck and low back for two months before releasing him to perform light and sedentary activities on Au *556 gust 30, 1995. Thomas was not released for regular duty work until November 16, 1995. Unfortunately, he returned to Dr. Heard on January 16, 1996, complaining of increased neck and low back pain, and was once again given a Celestone and Marcaine block and prescription Motrin. Dr. Heard then reduced his release from regular activities to the performance of light and sedentary activities as tolerated. The last report from Dr. Heard contained in the record, dated June 5, 1996, shows that he was still being treated for pain. We find that this evidence warrants a finding of physical injuries suffered by Thomas.
In West, 371 So.2d at 1147, our supreme court reiterated the appropriate standard for a claimant in a workers’ compensation suit:
In a workman’s compensation, suit, the employee must establish the work-accident causing the injury by a preponderance of the evidence-i.e., “the testimony, as a whole, must show that more probably than [not], the employment accident caused the disability.” Gradney v. Vancouver Plywood, Co., Inc., 299 So.2d 347, 349 (La.1974). The causal relationship may be inferred when there is proof of an accident and' an ensuing disability without an intervening cause. Johnson v. Travelers Ins. Co., 284 So.2d 888 (La.1973).
This, principle was also espoused in Aymond, 690 So.2d at 772 (citing Coley v. Wilson Oil Co., Inc., 620 So.2d 445 (La.App. 3 Cir.1993)), in which this court also stated “[w]hen there is proof of an accident and of a following disability, without an intervening cause, it is presumed that the accident caused the disability.” Consequently, because the record does not reveal an intervening cause which could have caused the injuries complained of by Thomas, we find that the evidence warrants a finding of physical and non-physical injuries suffered by the claimant as a result of a work-related accident. The record does not contain the information | igneeded to determine the compensation that should be awarded. It is, therefore, necessary to remand the case to the Office of Workers’ Compensation for this purpose.
Penalties and Attorney Fees
Thomas contends that the employer and its insurer failed to properly investigate his claim and pay compensation benefits and, therefore, he is entitled to penalties pursuant to La.R.S. 23:1201(E). In addition, he seeks attorney fees for the arbitrary and capricious denial of compensation benefits and relies on La.R.S. 23:1201.2.[1]
A workers’ compensation judge’s ruling with regard to penalties and attorney fees is a factual determination that will not be altered unless found to be clearly wrong or manifestly erroneous. Gibson v. Dynamic Indus., Inc., 96-1605 (La.App. 3 Cir. 4/2/97); 692 So.2d 1320. We find manifest error in this case.
The relevant workers’ compensation statute entitles claimants to penalties and attorney fees if payments are not paid timely ór are not authorized. La.R.S. 23:1201(F). Penalties and attorney fees can be avoided if the claim is reasonably controverted or if the nonpayment results from conditions that were beyond the control of the employer or insurer. La.R.S. 23:1201(F)(2). The penalty provision is provided in the workers’ compensation statute to discourage an attitude | mof indifference toward the injured employee. Faul v. Bonin, 95-1236 (La.App. 3 Cir.); 678 So.2d 627, writ denied, 96-2221 (La.11/15/96); 682 So.2d 769.
The test to determine if the employer or insurer has fulfilled its duty turns on whether the employer or his insurer had sufficient factual and medical information to reasonably counter the factual and medical information presented by the claimant. Hopes v. Domtar Indus., 627 So.2d 676 (La.App. 3 Cir.1993); Thibodeaux v. L.S. Womack, Inc., 94-1375 (La.App. 3 Cir. 4/5/95); *557 653 So.2d 123. In this ease, we believe Thomas is entitled to penalties and attorney fees because the employer failed to present the factual or medical information needed to reject his claim.
Cronin testified that based on the description of the accident, pictures obtained of the patrol ear, and a viewing of the accident scene by the adjuster, the agency simply did not believe that Thomas had been injured to justify rehabilitation; therefore, it denied the payment of medical benefits for rehabilitation purposes as early as January 3, 1995. The agency obviously ignored the recommendations for rehabilitation services made by the treating neurologists, and denied the benefits without providing sufficient factual or medical information to contradict the medical information that supported a need for rehabilitation. This premature denial of benefits for rehabilitation was also repeated when Dr. White of Rehabilitation Medicine made a second request. This denial is further proof of the unreasonable actions taken by the employer.
The employer also denied compensation benefits to Thomas because of malingering. This is another instance of the employer denying benefits without providing the factual or medical information needed to contradict that which |2osupported the conclusion that Thomas actually suffered from a conversion disorder and was, in fact, experiencing pain.
The reports of the five doctors who examined Thomas during his fourteen day hospital stay all stated that he was suffering from a conversion disorder. Although the issue of possible malingering was raised by Dr. Dawes and Dr. Benoit, they both testified that they could not rule out a conversion disorder because they had not been able to determine if Thomas was a malingerer. Notwithstanding this information, and the fact that the patient was discharged from the hospital with a final diagnosis of having suffered from a conversion disorder, the employer still denied the claim.
The medical records reflect that Thomas also suffered physical injuries that caused him pain for an extended period of time. This was corroborated by the fact that Thomas was treated for pain throughout his hospital stay and continued to be treated for pain by Dr. Heard, an orthopaedic surgeon, for at least another year. Although the claim for benefits was denied, the employer also failed to ever present any sufficient information to reasonably contradict the existence of these compensable physical injuries.
Another ground for awarding penalties and attorney fees was the failure of the employer to reasonably investigate Thomas’ claim before denying him benefits, and also its failure to further investigate the claim when it became aware that he was undergoing treatment with Dr. Heard. It is well-settled that “[a]n insurer or an employer is required to make a reasonable effort to ascertain an employee’s exact medical condition before benefits are terminated or denied.” Penn v. Wal-Mart Stores, Inc., 93-1262, p. 4 (La.App. 3 Cir.), 638 So.2d 1123, writ denied, 94-1835 (La.10/28/94); 644 So.2d 651. This is a continuing obligation. Id. Medical benefits were denied in the first days of Thomas’ hospital stay without consideration being given to the medical information available. The two officers who found Thomas unconscious at the scene of the accident were not questioned about the night of the accident arid their findings upon arrival at the scene before the denial was made. It is also noteworthy that not all of the medical records relevant to Thomas’ accident were reviewed by the town’s carrier before the claim was denied. Specifically, the record reflects that the emergency room records from Opelousas General Hospital were not obtained until November 1995 although the claim was denied in March 1995.
The employer also failed to obtain and review the medical records of Dr. Heard after becoming aware that Thomas was under his care. We believe these omissions reflect a failure to reasonably investigate the claim before denying benefits.
We find that penalties amounting to twelve percent of any unpaid compensation or medical benefits or $50.00 per calendar day, up to $2,000.00, whichever is greater, are owed to claimant Thomas. See La.R.S. 23:1201(F).
*558 Thomas is also entitled to attorney fees. The factors used to determine attorney fees are the degree of skill and ability exercised, the amount of the claim, the amount recovered, and the amount of time devoted to the case. Naquin v. Uniroyal, Inc., 405 So.2d 525 (La.1981); Thibodeaux v. Woman’s Hosp. of Acadiana Found., Inc., 578 So.2d 213 (La.App. 3 Cir. 1991). Thomas’ counsel filed the disputed claim for compensation with the Office of Workers’ Compensation and prepared pretrial statements and memoranda on behalf of Thomas. For discovery purposes, Thomas’ counsel propounded interrogatories and requests for production, prepared for and attended the depositions of three medical witnesses which were all held on different days and in different locations. Voluminous medical records regarding Thomas’ l^fourteen-day hospital stay and those pertaining to his year-long treatment with Dr. Heard were also reviewed. Counsel also prepared for and attended the trial of this matter in which eight witnesses were examined. Thereafter, counsel prepared an appellate brief in which the facts and legal issues of these proceedings were thoroughly analyzed.
It is our opinion that the workers’ compensation judge manifestly erred in failing to award attorney fees. We award Thomas $7,500.00 for attorney fees.
TV.

CONCLUSION

We find that claimant, Willis Thomas, proved by a preponderance of the evidence that he was involved in a work-related ear accident in which he sustained compensable injuries. In addition, we find the employer, the Town of Arnaudville, failed to pay compensation benefits to Thomas, and that he is entitled to penalties and attorney fees as a result of his employer’s failure to establish that the claim was reasonably controverted or that the nonpayment was beyond its control.
For the foregoing reasons, the judgment of the Office of Workers’ Compensation is reversed and remanded for a determination of compensation benefits and penalties, as the record does not provide sufficient information for this court to make the determination. Thomas is also awarded $7,500.00 in attorney fees for services rendered during the trial and appeal of this matter.
All costs are assessed to defendant-appellee, the Town of Arnaudville.
REVERSED AND REMANDED.
DOUCET, C.J., dissents.
GREMILLION, J., dissents on the basis of no manifest error in trial court.

. The plaintiff has incorrectly requested attorney fees pursuant to La.R.S. 23:1201.2, which awards attorney fees for a discontinuance of payment that is arbitrary, capricious, or without probable cause. In this case, there was never a discontinuance of payment. The plaintiff was never paid. Therefore, the relevant statutes are La.R.S. 23:1201; 23:1201(F); 23:1201(F)(2). Those sections provide for the payment of penalties and attorney fees for a failure to timely pay or a failure to authorize benefits.