STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

09-642


ROSHAWN PETE

VERSUS

QUALITY CONSTRUCTION SPECIALISTS
AND BRIDGEFIELD CASUALTY INSURANCE COMPANY


**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 4
PARISH OF LAFAYETTE, NO. 06-05352
SAM L. LOWERY, WORKERS' COMPENSATION JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Oswald A. Decuir, and
Billy Howard Ezell, Judges.

AMENDED AND, AS AMENDED, AFFIRMED.

Mark Alfred Ackal
P. O. Box 52045
Lafayette, LA 70505-2045
Telephone:  (337) 237-5500
COUNSEL FOR:
        Defendant/Appellant - Quality Construction Specialists

Craig Alan Davis
111 Mercury
Lafayette, LA 70503
Telephone:  (337) 231-5351
COUNSEL FOR:
        Plaintiff/Appellee - Roshawn Pete

**THIBODEAUX, Chief Judge.**

Defendant-appellants, Quality Construction Specialists and Bridgefield Casualty Insurance Company, assert that the Office of Workers' Compensation (OWC) was manifestly erroneous by finding that (1) Quality's employee, Roshawn Pete, proved he had a job-related accident, and (2) Pete was entitled to penalties and attorney fees. Pete answers the appeal, requesting attorney fees for the work on this appeal and asking this court to amend the OWC's judgment as it contains a clerical error. For the following reasons, we amend the OWC's judgment and, as amended, affirm.

## I.

### ISSUES

We shall consider whether:

(1) the Workers' Compensation Judge (WCJ) committed a manifest error by concluding that an employee had an accident in the course and scope of his employment, where the employee alleged that his cousin witnessed the accident, and where the cousin, three years after the accident, denied witnessing it; and,

(2) the WCJ committed a manifest error by awarding the employee attorney fees and penalties for three different infractions where the insurer:

    (a) within sixty days of the request's submission, denied the physician-recommended medical procedure, but approved it one day after the employee retained an attorney and filed a disputed claim for compensation; and,

    (b) did not approve two different medical consultations in excess of six months after the recommending physician faxed his recommendations to the insurer.

## FACTS

Pete started working for Quality in October of 2004. On April 15, 2005, Pete claimed he injured his back while in the course and scope of his employment. Pete testified that when he attempted to pick up a manhole cover that weighed about two hundred pounds, he felt pain in his back, fell to his knees and then forward into the bucket of a front-end loader. Pete testified that his cousin, who was also a co-worker, witnessed the accident and turned Pete over from his stomach to his back. The cousin then, according to Pete, summoned the supervisor, Mike Gentry, who, along with the cousin, lifted Pete up and brought him to the car. Over three years after the accident, Pete's cousin testified at the OWC hearing that he did not witness the accident and did not help Pete to the car.

One day after the accident, Pete sought and received emergency room treatment. He was taken off work and told to follow up with his personal physician. Subsequent doctor visits and an MRI revealed that Pete had a disc herniation. After unsuccessful therapy, massage, and pain medication, Dr. Ilyas Munshi, a neurological surgeon, recommended a discectomy that he performed in August of 2005.

Although Pete continued to experience back pain, Dr. Munshi reported that Pete could return to light-duty work. Pete returned to work on January 30, 2006, but he soon discovered that he could not perform the light-duty work Quality assigned him to do. He informed Quality that he could not physically perform his duties and has not attempted to work since.

On June 28, 2006, Pete saw Dr. Michel Heard, a local orthopedist, who concluded that Pete suffered from severe back and right radiculitis that prevented Pete from working in any capacity. Dr. Heard recommended, among other things, a

Lumbar Epidural Steroid Injection (LESI) series. According to Dr. Heard's records, an insurance adjuster denied the recommended LESI series on July 14, 2006. On August 9, 2006, Pete filed a disputed claim for compensation. On August 10, 2006, the insurance adjuster reversed her previous position and approved the LESI series. Dr. Heard subsequently recommended two more LESI series that the insurance adjuster treated in the same manner, first denying and then approving the treatment.

Dr. Heard's records of January 22, 2007 indicate that as of that date, Dr. Heard was waiting for the insurance adjuster's approval of two consultations he recommended. The first consultation would have been with Dr. Mark McDonnell, a spine surgeon. The second recommendation was to consult with a pain management specialist, Dr. Steven Staires. In the same report, Dr. Heard noted that Pete may need a discogram.

On February 28, 2007, at the defendants' initiation, Pete saw Dr. Gregory Gidman for a second medical opinion. Dr. Gidman concluded that Pete would not benefit from any further surgical intervention and that a discogram would not provide any useful information. Based on these conclusions, the insurance adjuster did not approve the recommended consultations.

Because of Dr. Heard and Dr. Gidman's inconsistent recommendations regarding a discogram, Bridgefield requested an independent medical examination of Pete that Dr. Peter Vizzi performed on June 28, 2007. Dr. Vizzi concluded that a discogram and a CT myelogram would provide additional information about Pete's condition. Dr. Vizzi also noted that, depending on the information gained from these procedures, Pete may need a second surgery.

After the insurance adjuster approved a discogram in August of 2007, Dr. Staires performed the procedure on August 21, 2007. The consultation with the

spine surgeon, Dr. McDonnell, whom Dr. Heard recommended in January of 2007, had to await the adjuster's approval even longer until the consultation took place on October 2, 2007.

At the hearing, the WCJ held that the defendants committed three infractions and awarded penalties in the amount of two thousand dollars per infraction. The WCJ also ordered the defendants to pay seven thousand dollars in Pete's attorney fees. In his reasons for judgment, the WCJ stated that the denial of the first LESI series was arbitrary and capricious. As the WCJ explained, no one could fault an adjuster who denied treatment for a good cause but, after receiving more information, changed her mind. Noting that the record did not supply a valid reason for the denial and that defendants failed to produce the adjuster at the hearing so as to ascertain whether the denial was warranted, the WCJ concluded that the denial was arbitrary and capricious. Although the adjuster ultimately approved the treatment within the statutory sixty day period, Pete had already undergone the expense of retaining counsel and filing the disputed claim for compensation based on the denial. The WCJ stated that the determination of the adjuster's reasons for denial was essential because, otherwise, the adjuster could deny the treatment, approve it the next week, then deny again, and repeat the same pattern for sixty days.

The WCJ further held that the defendants supplied no adequate explanation for the denial of recommended consultations with the spine surgeon and the pain management specialist. The WCJ found no support for the delay based upon Dr. Gidman's opinion.

In his written judgment, the WCJ awarded Pete only two penalties of two thousand dollars each and seven thousand dollars in attorney fees. Quality and Bridgefield appealed, claiming that the WCJ committed manifest errors by

4

concluding that Pete proved he had an accident" in the course and scope of his employment and by imposing penalties and attorney fees upon them. Pete answered the appeal stating that the OWC's judgment contained a clerical error as to the number of penalties. Pete requested this court to correct the error and to award an increase in attorney fees for the work on this appeal.

III.

## STANDARD OF REVIEW

The WCJ's findings of fact are reviewed under the "manifest error" or "clearly wrong" standard. *Jim Walter Homes, Inc. v. Guilbeau*, 05-1473 (La.App. 3 Cir. 6/21/06), 934 So.2d 239. The appellate courts do not disturb the WCJ's findings of fact as long as they are reasonable and supported by the record. *Id.* Finally, the WCJ's imposition of penalties and attorney fees upon an employer are likewise findings of fact subject to the manifest error standard. *Guilbeau*, 934 So.2d 239.

IV.

## LAW AND DISCUSSION

### (1) The Occurrence of a Work-related Accident

The determination as to whether an accident occurred involves a judgment of credibility to which an appellate court gives great deference on review. *Francis v. BFI*, 01-769 (La.App. 3 Cir. 12/12/01), 801 So.2d 604, *writ denied*, 02-101 (La. 3/22/02), 811 So.2d 934. Thus, the appellate court may find manifest error in a credibility determination where the "objective evidence so contradicts an employee's testimony, or testimony is so internally inconsistent or implausible on its face that a reasonable factfinder would discredit the story . . . ." *Butterfield v. Turner Indus.*, 06-1098, p. 6 (La.App. 3 Cir. 2/7/07), 951 So.2d 476, 480, *writ denied*, 07-507 (La.

5

4/27/07), 955 So.2d 692 (quoting *Hubbard v. Allied Bldg. Stores, Inc.*, 41,534, p. 5 (La.App. 2 Cir. 11/1/06), 942 So.2d 639, 643).

Here, Pete testified that his co-worker cousin witnessed the accident and helped him to the car afterward. The cousin testified that he did not witness the accident and did not help Pete. The WCJ apparently determined that Pete's testimony, supported by contemporaneous medical and other evidence, was more credible. Considering that the cousin provided his testimony over three years after the accident, we find no error in the WCJ's decision to accord this testimony less weight than Pete's account of the events and his medical and other evidence. Therefore, the WCJ was not manifestly erroneous by concluding that the accident in the course and scope of Pete's employment occurred.

### (2) Penalties and Attorney Fees

If the employer or insurer fails to pay medical benefits within sixty days after the employer or insurer receives written notice thereof, the employee is entitled to penalties and reasonable attorney fees unless the employee's claim is reasonably controverted. *See* La.R.S. 23:1201. Our jurisprudence has applied these sanctions not only where the employer or insurer failed to pay benefits, but also where the employer or insurer failed to authorize a medical procedure, subsequently deemed necessary, within sixty days of notice. *Lambert v. Brookshire Grocery Co.*, 06-1001 (La.App. 3 Cir. 12/20/06), 945 So.2d 918.

An employer could reasonably controvert a claim if the employer "engaged in a nonfrivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant . . . ." *Brown v. Texas-LA Cartage, Inc.*, 98-1063, p. 9 (La. 12/1/98), 721 So.2d 885, 890. The employer or insurer has a continuing duty to investigate the

employee's claim and to assess factual information before the denial of benefits. *Penn v. Wal-Mart Stores, Inc.,* 93-1262 (La.App. 3 Cir. 6/15/94), 638 So.2d 1123, *writ denied*, 94-1835 (La. 10/28/94), 644 So.2d 651. Thus, a failure to investigate the employee's claim subjects the employer or insurer to penalties and attorney fees. *McClendon v. Keith Hutchinson Logging*, 96-2373 (La.App. 1 Cir. 11/7/97), 702 So.2d 1164, *writ denied*, 97-2872 (La. 2/13/98), 706 So.2d 995. Moreover, "a workers' compensation claimant is entitled to an increase in attorney fees for time incurred in defending an employer's unsuccessful appeal." *Warren v. Maddox Hauling*, 02-733, p. 6 (La.App. 3 Cir. 12/4/02), 832 So.2d 1082, 1087, *writ denied*, 03-4 (La. 4/21/03), 841 So.2d 791. Finally, "[t]he appellate court shall render any judgment which is just, legal, and proper upon the record on appeal." La.Code Civ.P. art. 2164.

Here, with respect to the first LESI series, the defendants argue that because they ultimately authorized the treatment within the statutory sixty-day period, the WCJ committed a manifest error by imposing the penalty. Yet, the issue here is whether the insurance adjuster possessed factual and/or medical information to reasonably deny authorization for the treatment. Because the insurers and/or employers have a duty to investigate prior to the denial, it is reasonable for an employee to assume that the insurer was not arbitrary and capricious when it denied the employee's claim. This is why, in the absence of any information subsequent to the denial that could reasonably change the adjuster's mind, an employee can justifiably assume that the denial was final and act accordingly.[1] The defendants submitted no factual and/or medical information that would justify their refusal to

---

[1]Certainly, as the WCJ pointed out, if the insurance adjuster, after the denial, learns new information that warrants authorization of the procedure previously denied, then the support for the imposition of penalties becomes more questionable. Yet, this is not the case here, as there is a glaring lack of any justification for the initial denial and the subsequent change of position.

authorize the first LESI series or their sudden subsequent approval of it. This denial forced Pete to undergo the expense of hiring an attorney to file a disputed claim for benefits. Based on these considerations, the WCJ committed no manifest error by awarding the penalty.

The defendants next point to Dr. Gidman's report, arguing that it made reasonable their refusal to approve consultations with the spine surgeon and the pain management specialist. Dr. Gidman concluded that Pete would not benefit from a second surgery and would not need a discogram. There is nothing in Dr. Gidman's report that questions Dr. Heard's recommendations to *consult* a pain management specialist and a spine surgeon. Although the defendants focus extensively on Dr. Gidman's conclusion that a discogram was unnecessary, the WCJ did not impose a penalty on the defendants for the failure to authorize a discogram. Instead, the WCJ penalized the defendants for the failure to authorize the recommended consultations. Based on the considerations above, we find no manifest error with the WCJ's decision to impose penalties here.

From the record, it is clear that the OWC's written judgment contains a clerical error as to the number of penalties the WCJ imposed on the defendants. The hearing transcript unambiguously indicates that the WCJ imposed three penalties of two thousand dollars each for the three infractions discussed above. Yet, the written judgment provides only for two penalties. Under our authority to render judgment that is just, legal, and proper upon the record, we amend the OWC's judgment with respect to the number of penalties from two to three, and concomitantly increase the amount of the penalties from four thousand dollars to six thousand dollars.

Finally, we award three thousand dollars in attorney fees for Pete's counsel's work on appeal.

## V.

## <u>CONCLUSION</u>

The judgment in favor of Roshawn Pete is amended and, as amended, affirmed.  In addition, we order Quality Construction Specialists and Bridgefield Casualty Insurance Company to pay three thousand dollars in Roshawn Pete's attorney fees for the work on this appeal.

**AMENDED AND, AS AMENDED, AFFIRMED.**