722 So.2d 421 (1998)
Howard CURTIS, Plaintiff-Appellee,
v.
WET SOLUTIONS, INC. and Louisiana Workers' Compensation Corporation, Defendants-Appellants.
No. 98-789.
Court of Appeal of Louisiana, Third Circuit.
December 9, 1998.
*424 Maria Losavio, Alexandria, for Howard Curtis.
Patricia L. Barfield, Baton Rouge, for Wet Solutions.
Before THIBODEAUX, DECUIR and GREMILLION, Judges.
GREMILLION, Judge.
The defendants, Wet Solutions, Inc. and its insurer, Louisiana Workers' Compensation Corporation (LWCC), appeal a judgment by the workers' compensation judge finding the plaintiff, Howard Curtis, temporarily totally disabled and entitled to benefits from the date of his release, May 17, 1996. Curtis answered the appeal claiming that the workers' compensation judge erred by not finding Wet Solutions and LWCC arbitrary and capricious in terminating his weekly compensation benefits and refusing medical treatment, and he seeks an increase in attorney's fees for the work necessitated on appeal. For the following reasons, we reverse in part, affirm in part, and award additional attorney's fees.

FACTS
On December 16, 1996, Curtis filed a disputed claim for compensation with the Office of Workers' Compensation seeking reinstatement of his compensation benefits and penalties and attorney's fees for LWCC's arbitrary and capricious termination of his weekly compensation benefits and refusal to provide medical treatment. Curtis, an oil field consultant for Wet Solutions, was injured in a work-related accident on December 2, 1993, when he missed a step and fell hitting his shoulder. He had injured this same shoulder in a work-related accident two years prior to this accident. Further complicating matters was the fact that Curtis had developed a tremor in his right upper extremity because of Parkinson's disease. However, there is a dispute as to the onset of the tremor. Dr. Paul LeBlanc, Curtis' family physician, noted that Curtis told him that the tremor was progressive following his previous injury in 1992. Curtis and his supervisor, Dale Fackler, both testified that the tremor started subsequent to the December 2, 1993 accident.
Curtis underwent an arthroscopic subacromial decompression after being diagnosed with an impingement in his right shoulder by Dr. John Schutte, an orthopedic surgeon, and was released to return to work on January 31, 1995. At that time, LWCC terminated his weekly compensation benefits. However, due to his inability to perform his job duties, and his continuing complaints of right shoulder pain, LWCC reinstated Curtis' benefits on October 12, 1995.
After LWCC had Curtis examined by a neurologist, Dr. Thomas Bertuccini, who stated that he was disabled because of right shoulder pain and Parkinson's disease, Curtis was reexamined by Dr. Schutte. He felt that Curtis' rotator cuff had resolved, and opined that his pain was the result of an arthritic process involving the glenohumeral joint. He recommended a neurological evaluation for Curtis' tremors, but released him to return to work subject to restrictions. LWCC terminated Curtis' weekly compensation benefits on May 17, 1996, based on this report.
Following his release, Curtis did not return to work and Fackler did not attempt to employ him because he did not believe Curtis could perform his job. Fackler even faxed a copy of Curtis' job position to LWCC, in which he stated that Curtis could not perform his job duties because of his inability to write with his right hand and his difficulty in driving.
After being released by Dr. Schutte, Curtis returned to Dr. Kenneth Mauterer on May 24, 1996.[1] In his records, Dr. Mauterer stated, "I am not saying that pt does not have Parkinsonism but I feel he is having something else going on in the shoulder that is causing as much shoulder pain & tenderness that he has which also incapacitates *425 him." Although Dr. Schutte had released Curtis, Dr. Mauterer felt there had been no determination that anything was going on above the trapezius muscle or the nerve there that could cause a problem. Due to Curtis' continued complaints of pain in his right shoulder and the tremor in his upper right extremity, Dr. Mauterer had him evaluated by Dr. Roger Kelly, the chairman of the Department of Neurology at the Louisiana State University School of Medicine in Shreveport, Louisiana.
On July 31, 1996, Dr. Kelly noted, along with signs of Parkinson's disease, diminished pinprick sensation in Curtis' right upper extremity, but with no particular dermatome pattern followed. Because he felt Curtis was suffering from neuralgic pain, or pain from an irritated nerve, in his right upper extremity, he placed him on Neurontin. Both Curtis and his wife noted a significant lessening of his tremor afterwards, along with increased dexterity in his right hand and a sense of increased strength.
An EMG and nerve conduction velocity studies performed by Dr. Gloria Galloway, an assistant professor of neurology at the LSU Medical Center, on September 17, 1996, revealed:
The presence of polyphasic motor units in the APB and 1st DI muscles on the right indicate a chronic lesion possibly at C8-T1 innervated roots with reinnervation. There is no evidence of active or ongoing denervation at this time. There is no evidence on this study to support a plexopathy or mononeuropathy of an entrapment type.
Dr. Kelly stated this was usually seen when there had been damage to a nerve, which then repaired itself through reinnervation. He felt that there was an irritation of the nerves in association with the shoulder process as shown by the burning and shooting component of Curtis' pain, and because of the positive response shown from the use of medicine used to treat nerve pain.
Dr. Kelly also referred Curtis to Dr. Kalia Sadasivan, an orthopedic surgeon with the LSU Medical Center. Dr. Sadasivan's examination on October 2, 1996, revealed pain and weakness on abduction, and difficulty initiating abduction. He further noted an obvious impingement when Curtis internally rotated his arm and forward flexes. Dr. Sadasivan's impression was rotator cuff atrophy.
Feeling that Curtis' right upper extremity tremor was contributing to his right shoulder discomfort, Dr. Kelly attempted to control the tremors through the use of several different anti-Parkinson's disease medications. None of these medications seemed to lessen his tremors.
Despite several demands by Curtis, LWCC refused to reinstate his weekly compensation benefits and approve further medical treatment based on Dr. Schutte's May 17, 1996 report. On December 16, 1996, Curtis filed a disputed claim for compensation, seeking benefits and penalties, and attorney's fees.
On January 24, 1997, Dr. Mauterer stated that Curtis' tremor was possibly caused by Parkinsonism, but that it had not readily changed while he was on anti-Parkinsonism medications. Thus, he thought that there were two possible components affecting Curtis: 1) Parkinsonism and 2) nerve damage to the right shoulder and a torn rotator cuff. He noted that Curtis' tremor did change with the position of his shoulder. Finally, he noted that, although not all of Curtis' symptoms may be related to his December 2, 1993 accident, part of them were. On February 3, 1997, Dr. Kelly found that Curtis still had a prominent tremor of his right upper extremity, associated with significant functional impairment.
On February 17, 1997, Dr. Mauterer reported:
The primary diagnosis that he has Parkinsonism. May have Parkinsonism component but this pt also exhibiting signs & symptoms of nerve damage & some joint damage. I don't think that his symptoms can be explained away as just Parkinsonism... but I don't think that since he has perfect balance & has no cog wheeling that everything can be explained away as just Parkinsonism.
Following a mediation hearing, the parties agreed that Curtis would return to Dr. Arsham Naalbandian, a neurologist he had previously seen, for reevaluation. When Dr. Naalbandian *426 examined him, on February 24, 1997, his impression was that Curtis was suffering from post-traumatic pain involving the right shoulder region, questionably related to a rotator cuff injury; diffuse pain involving the right upper extremity; and uncontrolled Parkinson's disease involving the right upper extremity. Dr. Naalbandian felt that the Parkinson's disease might inadvertently be contributing to Curtis' symptoms of pain involving the right shoulder and arm, although he did not feel that it was the main etiology of the pain. Follow-up EMG and nerve conduction velocity studies of the right upper extremity and paraspinals were essentially normal. Dr. Naalbandian noted that there seemed to be some minor denervative changes with some decreased motor units involving the abductor pollicis brevis muscle on the right, but no active denervation was noted. He stated that there were no clear findings to indicate motor root involvement in the cervical region on the right side or any other neuropathic or myopathic abnormalities. In a note dated March 6, 1997, Dr. Naalbandian stated that he believed the etiology of Curtis' pain was mostly related to his shoulder joint on the right. He recommended follow-up with an orthopedic for further management of his pain, and follow-up treatment with Dr. Kelly for his Parkinson's disease.
On April 4, 1997, Dr. Kelly noted no improvement in Curtis' right upper extremity pain, which included an intermittent sharp shooting and burning component. In his report, he stated that "[t]he most pressing issue is his right shoulder pain."
Curtis was examined by Dr. John Ferrell, an orthopedic surgeon, on April 15, 1997, whose impression was that Curtis was suffering from a rotator cuff tear, significant crepitation in the subacromial arch with some associated degenerative osteoarthritis. He recommended an arthrogram, which revealed some irregularity of the humeral head and glenoid consistent with degenerative changes. There was satisfactory filling of the joint, and no evidence of rotator cuff tear or other abnormality. In his deposition, Dr. Ferrell stated that a negative arthrogram would only rule out a severe tear with retraction, but not a partial tear or one that was sealed over.
On July 14, 1997, Dr. Kelly noted an increased neuralgic-type pain in Curtis' right upper extremity, which was described as a continuous soreness with an intermittent burning and shooting component. Dr. Kelly felt that Curtis' right upper extremity neuralgia was essentially unchanged and might be a bit worse since he had stopped taking Neurontin. He believed that Curtis' right upper extremity discomfort was aggravated by his rather prominent tremor related to Parkinson's disease. Dr. Kelly resumed Curtis on Neurontin.
Curtis was also seen by Dr. Ferrell on July 14, 1997. Although he believed that Curtis had a perplexing problem, Dr. Ferrell felt that he had right shoulder degenerative osteoarthritis. He determined that the decompression performed by Dr. Schutte was adequate, but still observed quite a bit of crepitation in Curtis' shoulder, which appeared to be subacromial and glenohumeral crepitation. Dr. Ferrell did not think that Curtis' tremors were related to his shoulder surgery, but stated that he would like to discuss the case with Dr. Kelly because he could not explain why changing positions would cause Curtis' tremors to go away. Dr. Ferrell explained that replacing Curtis' shoulder due to osteoarthritis would be hazardous due to his Parkinsonism and his tremors. He stated that he would see how Curtis' tremors responded to new medication Dr. Kelly prescribed. Once the tremors stopped, Dr. Ferrell felt that perhaps Curtis' shoulder pain would resolve. Dr. Ferrell, along with Drs. Mauterer and Kelly could not explain why Curtis' tremor would decrease when he placed his arm in certain positions. All three doctors, as well as Fackler and Curtis' wife, observed this happening.
A hearing was held in this matter on September 12, 1997. The parties stipulated to Curtis' average weekly wage, his compensation rate, and the time periods that he received benefits. The parties further stipulated that Curtis was within the course and scope of his employment at the time of his injury on December 2, 1993.
*427 After taking the matter under advisement, the workers' compensation judge issued oral reasons for judgment on September 19, 1997, finding that Curtis remained temporarily totally disabled from the date of Dr. Schutte's release, May 17, 1996, through the present. She held that his disability was related to his work accident of December 2, 1993, and that Parkinson's disease had aggravated his condition. She further held that he was entitled to continued treatment for his shoulder, and back due indemnity benefits in the full amount. With regard to Curtis' claim for penalties and attorney's fees, the workers' compensation judge held that LWCC was reasonable in denying Curtis medical treatment based on Dr. Schutte's report. However, she awarded penalties and attorney's fees for LWCC's failure to timely pay a medical bill pertaining to Curtis' surgery, and for failing to reimburse him for mileage he undertook in seeing Dr. Naalbandian subsequent to the mediation hearing. A judgment was signed by the workers' compensation judge on December 12, 1997. Wet Solutions and LWCC suspensively appeal these findings. Curtis answered this appeal.

ISSUES
Wet Solutions and LWCC raise three assignments of error on appeal:
1) The workers' compensation judge erred in finding Curtis temporarily totally disabled from the injury sustained in the work accident.
2) The workers' compensation judge erred in awarding Curtis medical evaluation and treatment for a "cervical" injury.
3) The workers' compensation judge erred in ordering them to pay for treatment by Drs. Kelly and Ferrell, beyond the $750.00 limit set forth in La.R.S. 23:1142(D).
Curtis answered the appeal by Wet Solutions and LWCC arguing that the workers' compensation judge erred in failing to find them arbitrary and capricious for terminating his weekly compensation benefits, and for their failure to authorize medical treatment. He further claims that he is entitled to additional attorney's fees for the work necessitated by this appeal.

TEMPORARY TOTAL DISABILITY
In their first assignment of error, Wet Solutions and LWCC argue that the workers' compensation judge erred in finding Curtis temporarily totally disabled as a result of his work-related injury. Although they admit that Curtis is disabled, they claim that his disability is the result of a combination of arthritis and Parkinson's disease.
The appellate standard of review in workers' compensation cases was recently reiterated in Seal v. Gaylord Container Corp., 97-0688, pp. 4-5 (La.12/2/97); 704 So.2d 1161, 1164 (citations omitted):
Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Where there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong. "Thus, `if the [factfinder's] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" Banks [v. Industrial Roofing & Sheet Metal Works], 96-2840 at p. 8 [(La.7/1/97)], 696 So.2d [551] at 556 (quoting Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La. 1990)).
The manifest errorclearly wrong standard of review applies even when the evidence before the workers' compensation judge consists solely of written reports, records, and depositions. Alexander v. Pellerin Marble & Granite, 93-1698 (La.1/14/94); 630 So.2d 706.
In order to prove entitlement to temporary total disability (TTD) benefits, a claimant must prove by clear and convincing evidence, unaided by any presumption of disability, that he is physically unable to engage in any employment or self-employment. La. R.S. 23:1221(1)(c). Clear and convincing evidence *428 is a heavier burden than the "preponderance of the evidence" standard, but is less than the "beyond a reasonable doubt" standard. Bundren v. Affiliated Nursing Homes, Inc., 94-808 (La.App. 3 Cir. 2/1/95); 649 So.2d 1177.
An employee's preexisting condition does not preclude recovery under the workers' compensation laws since the employer takes the employee as he finds him. Stelly v. Guy Scroggins, Inc., 96-401 (La. App. 3 Cir. 10/9/96); 682 So.2d 782, writ denied, 96-3060 (La.2/7/97); 688 So.2d 503. An abnormally susceptible employee is entitled to the same amount of protection as a healthy employee, and it is immaterial that the diseased or weakened condition of the employee might eventually produce the disability suffered outside of the employment situation. Baker v. Conagra Broiler Co., 93-1230 (La.App. 3 Cir. 5/4/94); 640 So.2d 494, writ denied, 94-1435 (La.9/23/94); 642 So.2d 1289. Accordingly, an employee's claim for compensation benefits will not be disqualified if the work-related injury aggravates, accelerates, or combines with a disease or infirmity to produce disability for which compensation is claimed. Id.
Additionally, the employee's work injury is presumed to have aggravated, accelerated or combined with his preexisting disease or infirmity to produce his disability when the employee proves that before the accident he had not manifested disabling symptoms but that commencing with the accident the disabling symptoms appeared and manifested thereafter and medical or circumstantial evidence indicates a reasonable possibility of a causal connection.
Stelly, 682 So.2d at 786 (citation omitted).
Curtis testified that he attempted to work after Dr. Schutte released him at the end of January 1995, but was unable to because of pain in his right shoulder and arm, and swelling in his hand, which rendered him unable to write. Curtis also testified that he was unable to drive for long periods of time because of the pain in his shoulder. He said that the tremors from the Parkinson's disease did not bother him, instead it was the pain in his shoulder which prevented him from doing his job. Curtis further testified that he could make the tremors in his arm stop by placing his right hand over his head, a fact which he was able to show Drs. Mauterer, Kelly, and Ferrell. He stated that the more his shoulder hurts, the worse his tremors are. However, he could not state whether the pain was causing the tremors or vice versa.
Curtis' wife, Wylodine, testified that when he tried to return to work after Dr. Schutte's release, he was unable to drive because of pain and that he could not write with his right hand. When he did drive, she stated that he drove with his left hand, and that he could only drive for short distances. She testified that she observed Curtis placing his hand over his head, which relieved his pain and stopped his tremors. When he was able to grasp an object with his right hand, Wylodine stated that he was unable to let go of it, and had to use his left hand to release his right hand. Fackler testified that Curtis was employed as an oil field consultant at the time of his accident, which required him to travel offshore to monitor the work performed by contractors at the work site. Traveling to the various ports when going offshore required him to travel upwards of two hundred and fifty miles or more if the port was located in Texas. Fackler testified that Curtis could drive seven or eight hundred miles if the weather was bad, since he would have to leave the work site and then return after the weather cleared. Fackler further testified that Curtis was required to write reports to send to the oil companies he was consulting for. In addition to his oil field consulting work, Fackler stated that Curtis was also making sales calls on oil companies, which required a lot of driving.
Fackler testified that after Curtis injured his right shoulder on December 2, 1993, Wet Solutions stopped sending him offshore and had him concentrating on sales. When Curtis was released to return to work in January 1995, Fackler testified that he attempted to work, however, he was unable to drive or write with his right hand. He stated that Curtis would drive with his left hand, and would reach across the steering wheel with his left hand to start his vehicle. Fackler said he eventually told Curtis that it was *429 unsafe for him to drive the number of miles required by his sales trips.
When Curtis was released by Dr. Schutte on May 17, 1996, Fackler made no attempt to return him to work because he did not believe that Curtis could perform his job duties. On May 28, 1996, Fackler faxed a copy of Curtis' job description to LWCC, in which he stated that Curtis could no longer work offshore as a consultant, and that his position was now in sales along the Gulf Coast. He commented that Curtis' present position could not be modified, nor were there any other positions available to him. Fackler stated that driving was difficult for Curtis, and that his inability to write presented a problem.
Fackler knew that Curtis had suffered a prior injury to his right shoulder while loading a truck during his previous employment. He further stated that Curtis complained of aggravating that injury only once after he was hired by Wet Solutions. Otherwise, Fackler stated that Curtis only complained about his shoulder bothering him on a few occasions, and he was able to fulfill his duties as an oil field consultant and sales representative without problem. It was only after his December 1993 injury that he was unable to perform his job.
Fackler testified that after Curtis injured his right shoulder in December 1993, he was in pain and unable to raise his arm. After a period of time, he stated that they began to observe tremors in Curtis' arm. Fackler felt that those tremors had progressed since they first began. He also admitted that he had seen occasions when Curtis was able to decrease or eliminate the tremors, and, thereby, reduce his pain by placing his right arm above his head. He observed that Curtis' right shoulder pain appeared to be constant.
Drs. Kelly, Ferrell, and Mauterer all agreed that, although Curtis was suffering from Parkinson's disease, he did have a problem with his right shoulder which was causing his pain. Drs. Kelly and Ferrell both agreed that Curtis' tremors negatively affected the condition of his right arm. Dr. Kelly felt that Curtis was suffering from an irritated nerve, which was negatively affected by the tremor. He estimated that sixty to seventy percent of Curtis' problem resulted from pain and the remainder was due to Parkinson's disease. In order for Curtis to completely recover, he opined that they would have to get the tremors under control, as well as the shoulder pain.
Dr. Ferrell felt that Curtis had a rotator cuff problem, combined with right shoulder degenerative osteoarthritis and Parkinson's disease. Because of Curtis' conditions, Dr. Ferrell stated that a total shoulder replacement was out of the question. He felt that the only way to determine the cause of Curtis' shoulder problem was to scope his shoulder. If he had to operate and take down muscle, Dr. Ferrell stated that they could end up with a potentially worse problem because the tremors could cause the muscle to tear after being reattached. If Curtis only had a shoulder problem, Dr. Ferrell testified that they would have already replaced his shoulder or re-operated on it. Neither doctor could pinpoint the exact cause of Curtis' condition. Nor could they, or Dr. Mauterer, explain why placing his arm in certain positions would relieve Curtis' pain and tremors.
All three doctors agreed that Curtis' right arm was essentially useless. Dr. Mauterer testified that Curtis could not engage in his prior employment because of his right arm pain. He stated that he would be unable to sit for long periods of time, such as traveling long distances, because he constantly had to change positions due to his arm pain. Dr. Kelly described Curtis' right arm as a functionally useless upper right extremity. He stated that Curtis' symptoms, a prominent tremor and significant pain, would limit him in both sedentary as well as more physically active job descriptions. He felt that Curtis' primary complaint was his right shoulder pain. Dr. Ferrell testified that he did not believe that Curtis was employable, mostly because of his Parkinson's disease. He stated that if Curtis did not have Parkinson's disease and he was restricted from using his right arm, then he would be employable. However, he admitted that scenario would probably never happen.
*430 In finding Curtis temporarily totally disabled, the workers' compensation judge stated the axioms that a defendant takes his plaintiff as he finds him, and that the employer is liable for the aggravation of a pre-existing condition, if it results from the work-related injury. She disagreed with Dr. Schutte, that Curtis was capable of returning to work in May 1996, finding that he had attempted to do so previously, but was unable to because of his condition. She stated that Fackler found Curtis incapable of doing his job and had attempted to place him in a light duty position, but felt he was a danger to himself and others because of the position's travel requirements. The workers' compensation judge further found that Dr. Schutte was unaware of what Curtis' job entailed, since he did not have a job description nor did he attempt to obtain one.
Finally, the workers' compensation judge stated that Dr. Schutte disregarded Curtis' continued complaints of right shoulder pain with the explanation that he was suffering from arthritis. However, she pointed out that when an arthritic condition is rendered symptomatic by a work-related injury, the employer is responsible for that condition. Although Curtis did experience some pain relief after the surgery, the workers' compensation judge found that he continued experiencing pain, which was aggravated by his tremors. Accordingly, the workers' compensation judge held that Curtis was temporarily totally disabled as a result of his work-related accident, which was aggravated by his Parkinson's disease.
Considering the evidence, it was reasonable for the workers' compensation judge to find that Curtis proved clearly and convincingly that he was still temporarily totally disabled as a result of his work-related accident when released by Dr. Schutte on May 17, 1996, and that this injury combined with his Parkinson's disease and made sympomatic the degenerative arthritis in his right upper extremity, resulting in his present condition. Since there was no evidence presented to the contrary, and Curtis' own supervisor testified that he was unable to fulfill his previous employment duties, we affirm the judgment awarding Curtis TTD benefits, backdue benefits, and continued medical treatment for his work-related injury.

CERVICAL INJURY
In their second assignment of error, Wet Solutions and LWCC argue that the workers' compensation judge erred in awarding Curtis continuing medical treatment for cervical injuries arising from his work-related accident. Curtis counters, arguing that the record clearly reflects an on-going neck condition which resulted from his December 2, 1993 accident. He correctly points out that the workers' compensation judge stated, in her oral reasons, that Dr. Mauterer noted he had continued complaints of neck and shoulder pain.
Although the judgment, which was prepared by Curtis, does award him continuing medical treatment for cervical injuries arising from his December 2, 1993 accident, the workers' compensation judge's oral reasons do not make such an award. Rather, the workers' compensation judge stated:
So, it is the finding of this Court that Mr. Curtis remained disabled from May of 1995 and through the present. This disability is related to his work accident in December of 1993, the Parkinson's has aggravated it, he is entitled to continued treatment for his shoulder.
Thus, we find that the workers' compensation judge did not award continuing medical treatment for a cervical injury. However, we note that Curtis is entitled to continuing medical treatment for any condition whose etiology can be traced to his work-related injury. Accordingly, the portion of the judgment awarding Curtis continuing medical treatment for a cervical injury is reversed.

MEDICAL TREATMENT
Wet Solutions and LWCC finally argue that the workers' compensation judge erred in ordering them to pay for treatment by Drs. Kelly and Ferrell, beyond the $750.00 limit set forth in La.R.S. 23:1142(D),[2] *431 when he had already chosen and been examined by his choice of neurologist and orthopedic surgeon.
La.R.S. 23:1142(B), provides in pertinent part:
Except as provided herein, each health care provider may not incur more than a total of seven hundred fifty dollars in nonemergency diagnostic testing or treatment without the mutual consent of the payor and the employee as provided by regulation.
Although we agree that La.R.S. 23:1142 is pertinent to the determination of this issue, we rely on Subsection E to deny Wet Solutions and LWCC's claim. It provides that:
In the event that the payor has denied that the employee's injury is compensable under this Chapter, then no approval from the payor is required prior to the provision of any diagnostic testing or treatment for that injury.
In this instance, LWCC denied the compensability of Curtis' injury on May 17, 1996, when it terminated his workers' compensation benefits based on Dr. Schutte's report. Thus, Curtis was not required to seek prior approval for the nonemergency diagnostic testing that was performed by Drs. Kelly and Ferrell concerning his work-related injury. Herrell v. Tempo Personnel, 633 So.2d 690 (La.App. 1 Cir.1993), writ denied, 94-0236 (La.3/18/94); 635 So.2d 1101, relying on Jefferson v. Greer Timber Co., 618 So.2d 21 (La.App. 3 Cir.1993).
Once an employee has chosen a treating physician in any field or specialty, he may not seek treatment with another physician in that same field or specialty unless he obtains prior consent from his employer. La.R.S. 23:1121(B). However, an employee may still recover medical expenses for treatment provided by another physician or specialist for which he did not seek prior approval, with the exception of the initial unauthorized visit, if he proves that the treatment was both reasonable and necessary. Dupree v. Ace Home & Auto, 96-745 (La. App. 3 Cir. 12/26/96); 685 So.2d 683, writ denied, 97-0283 (La.3/27/97); 692 So.2d 393; La.R.S. 23:1203. The employee's burden is proof by a preponderance of the evidence. Alleman v. Fruit of the Loom-Crowley, 96-1246 (La.App. 3 Cir. 3/5/97); 692 So.2d 485.
The affirmation of the workers' compensation judge's finding that Curtis remained temporarily totally disabled following his release by Dr. Schutte, necessarily includes a finding that the treatment by Drs. Kelly and Ferrell was necessary and reasonable. As noted by the workers' compensation judge, Curtis did not seek recovery of his expenses pertaining to treatment for his Parkinson's disease, so that is not at issue. Although not specified, we note that Curtis is entitled to recover the expense of his initial visit to Dr. Kelly since he was referred to him by Dr. Mauterer. The workers' compensation judge held that Curtis was entitled to switch to Dr. Mauterer without seeking prior approval from LWCC when his previous family physician moved out of state. This finding was reasonable. Additionally, an employee's treating physician is entitled to seek whatever consultations are medically necessary to determine the claimant's course of treatment. Lemoine v. Hessmer Nursing Home, 94-836 (La.App. 3 Cir. 3/1/95); 651 So.2d 444. Dr. Mauterer sent Curtis to Dr. Kelly for consultation regarding his work-related shoulder injury and Parkinson's disease.
With regard to Dr. Ferrell's expenses, we find that Curtis may not recover the expense of his initial unauthorized visit to Dr. Ferrell since he had chosen Dr. Schutte as his treating orthopedic surgeon. Curtis testified that he did not return to Dr. Schutte because he felt it would be useless for him to do so. He stated that Dr. Schutte felt there was nothing further he could do for him. Since we have held that Dr. Ferrell's treatment was reasonable and necessary, Curtis is entitled to recover his expenses for all medical treatment subsequent to his first unauthorized visit.
For the forgoing reasons, this assignment of error is dismissed as being without merit. The judgment of the workers' compensation judge is affirmed, with the exception that Curtis is not entitled to recover the expense of his first visit by Dr. Ferrell.

*432 ANSWER TO APPEAL
Curtis raises two issues in his answer to Wet Solutions' and LWCC's appeal. He argues that the workers' compensation judge erred in failing to find that they acted arbitrarily and capriciously in terminating his weekly compensation and medical benefits, and he seeks additional attorney's fees for the work necessitated by this appeal. Curtis relies on the testimony of Demita Rogers, LWCC's claims adjustor, in support of his argument that the workers' compensation judge erred in finding that their actions did not rise to the level of arbitrary and capricious.
The refusal to award penalties and attorney's fees is essentially a finding of fact which will not be reversed unless it is clearly wrong or manifestly erroneous. Gibson v. Dynamic Indus., Inc., 96-1605 (La. App. 3 Cir. 4/2/97); 692 So.2d 1320.
A workers' compensation claimant is entitled to penalties and attorney's fees if benefits are withheld or terminated arbitrarily, capriciously or without reasonable cause by the employer. La.R.S. 23:1201; 23:1201.2. The purpose of the penalty provision is to discourage an attitude of indifference toward the injured employee. Spinks v. Dept. Of Health and Human Res., 591 So.2d 423 (La.App. 3 Cir.1991), writ granted in part, 595 So.2d 648(La.), on remand, 605 So.2d 1384 (La.App. 3 Cir.1992). To avoid the imposition of penalties, an employer must reasonably controvert the claimant's right to compensation. La.R.S. 23:1201(E). Maxie, 657 So.2d 443. The test to determine if the employer has fulfilled its duty is whether the employer or his insurer had sufficient factual and medical information to reasonably counter the factual and medical information presented by the claimant. Thibodeaux v. L.S. Womack, Inc., 94-1375 (La. App. 3 Cir. 4/5/95); 653 So.2d 123; Penn v. Wal-Mart Stores, Inc., 93-1262 (La.App. 3 Cir. 6/15/94); 638 So.2d 1123, writ denied, 94-1835 (La.10/28/94); 644 So.2d 651.
Faul v. Bonin, 95-1236, pp. 8-9 (La.App. 3 Cir. 8/7/96); 678 So.2d 627, 632, writ denied, 96-2221 (La.11/15/96); 682 So.2d 769.
Rogers testified that LWCC decided to terminate Curtis' benefits based solely on Dr. Schutte's May 17, 1996 report. Even though LWCC later learned that Drs. Mauterer, Kelly, Ferrell, and Naalbandian all felt that Curtis continued to suffer due to right shoulder pain, it refused to reinstate his benefits or approve further medical treatment. Rogers explained LWCC's continued refusal by stating that Dr. Schutte was the treating orthopedic surgeon, that it had not approved Curtis to see Dr. Ferrell, that Dr. Kelly was not Curtis' choice of neurologist, and that LWCC thought that he was only treating Curtis for his Parkinson's disease.
A workers' compensation insurer cannot blindly rely on earlier optimistic medical reports when presented with medical information revealing a disability. Such reliance will result in the imposition of penalties and attorney's fees. Gibson, 692 So.2d 1320. In this instance, LWCC blindly relied on Dr. Schutte's May 17, 1996 report releasing Curtis to return to work even in the face of subsequent reports revealing a continued disability from his work-related injury. LWCC refused to reinstate Curtis' benefits even after learning from Fackler that Curtis could not perform his job duties. LWCC made no attempt to gain further information concerning Curtis' condition by referring him for further testing as it did before authorizing the surgery performed by Dr. Schutte. Thus, we find that its actions did rise to the level of being arbitrary and capricious.
The workers' compensation judge denied Curtis' request for penalties and attorney's fees, finding that a legitimate basis for LWCC's continuing refusal to reinstate his benefits existed through Dr. Schutte's report, and even the reports of Drs. Bertuccini and Naalbandian. We disagree. Although both Drs. Bertuccini and Naalbandian agreed that Curtis was suffering from Parkinson's disease, they also stated that he was suffering from right shoulder pain. Prior to Dr. Schutte's release, Dr. Bertuccini, in an April 24, 1996 letter to Rogers, stated that Curtis' primary problem was his right shoulder pain, and that he was disabled because of that pain and Parkinson's disease. Dr. Naalbandian, who examined Curtis on February 24, 1997 *433 and March 6, 1997, stated in his report, which was sent to LWCC, that he believed the etiology of Curtis' pain was mostly related to his shoulder joint on the right. Thus, LWCC was put on notice prior to and following Dr. Schutte's' report that Curtis was still suffering from problems in his right shoulder.
Considering the foregoing evidence, we find that LWCC failed to present sufficient factual and medical information to reasonably counter that presented by Curtis. Accordingly, we find manifest error in the workers' compensation judge's failure to find that Wet Solutions and LWCC acted arbitrarily and capriciously in terminating and refusing to reinstate Curtis' weekly compensation and medical benefits despite evidence of a continuing disability. Curtis is entitled to penalties of twelve percent of any unpaid compensation or medical benefits or $50.00 per calendar day, up to $2,000.00, whichever is greater. La.R.S. 23:1201(E).
Additionally, Curtis is entitled to attorney's fees pursuant to La.R.S. 23:1201.2. The factors used to determine this award are the degree of skill and ability exercised, the amount recovered, and the amount of time devoted to this case. Thomas, 713 So.2d 547. In pursuing this matter, counsel for Curtis attended a mediation conference, filed a pre-trial statement, attended the pre-trial conference, and submitted five demand letters seeking reinstatement of Curtis' benefits. In preparing for trial, counsel propounded interrogatories and requests for production of documents, obtained medical records from all examining doctors, and participated in the depositions of three doctors. Counsel also prepared for and participated in the trial, at which four witnesses were examined, and attended the ruling at a later date. Following Wet Solutions' and LWCC's appeal of this matter, counsel for Curtis prepared an answer to that appeal as well as an appellate brief. Considering the work done in this matter, we award Curtis $5,000.00 in attorney's fees for work done prior to the appeal, and an additional $2,500.00 for work done subsequently. This amount is in addition to the $2,000.00 already awarded by the workers' compensation judge.

CONCLUSION
For the foregoing reasons, that portion of the judgment awarding the plaintiff-appellee, Howard Curtis, continuing medical benefits for a cervical injury is reversed. The judgment is amended to award him penalties of twelve percent of any unpaid compensation or medical benefits or $50.00 per calendar day, up to $2,000.00, whichever is greater, and an additional amount of $7,500.00 in attorney's fees. The costs of this matter are assessed to the defendants-appellants, Wet Solutions, Inc. and its insurer, Louisiana Workers' Compensation Corporation.
REVERSED IN PART; AND AFFIRMED AS AMENDED.
NOTES
[1] Curtis began seeing Dr. Mauterer after Dr. LeBlanc moved to Virginia. Dr. Mauterer became Curtis' family physician.
[2] Although Wet Solutions and LWCC cited La. R.S. 23:1142(D) in their appellate brief, we believe that they intended to cite La.R.S. 23:1142(B).