831 So.2d 1037 (2002)
Patricia SCUDERI
v.
CRAZY JOHNNIE CAFÉ, INC.
No. 02-CA-243.
Court of Appeal of Louisiana, Fifth Circuit.
October 16, 2002.
*1039 Richard L. Seelman, Wayne J. Fontana, Courtenay, Hunter & Fontana, New Orleans, LA, for Appellant Crazy Johnnie Café, Inc.
G. Patrick Hand, Jr., Gretna, LA, for Appellee Patricia Scuderi.
Panel composed of Judges JAMES L. CANNELLA, CLARENCE E. McMANUS and HENRY G. SULLIVAN, JR., Pro Tempore.
JAMES L. CANNELLA, Judge.
The Defendant, Crazy Johnnie Café, Inc., appeals from a workers' compensation judgment in favor of the Plaintiff, Patricia Scuderi. We amend in part and affirm as amended.
The Plaintiff was injured in a fall while working as a waitress at the Defendant's restaurant on September 27, 1995, where she had been employed since 1990. After the accident, she continued to work despite the injuries to her neck, back, and chest. On September 20, 1996, the Plaintiff filed a claim for workers' compensation benefits *1040 and she stopped working on September 24, 1996 due to neck problems.
Dr. Daniel Sinclair, an orthopedic physician, initially treated the Plaintiff. When her neck and back pain did not improve, he referred her to Dr. John Logan, an orthopedic surgeon, specializing in spinal conditions. When the need for surgery on her neck became apparent, she went to Dr. David Aiken for a second opinion. The Defendant thought that she had changed treating physicians. Nevertheless, Dr. Aiken recommended cervical surgery as soon as possible, based on her symptoms and the results of a magnetic resonance imaging (MRI) test taken April 2, 1996, which showed two herniated discs. The Plaintiff consented, believing that she could not go back to Dr. Logan for the surgery because the insurer was in the midst of corporate changes and she was told it would be another six weeks before she could obtain approval for surgery by Dr. Logan. Since Dr. Aiken's treatment had already been approved, the surgery was set for April 16, 1996.
The Defendant paid some medical expenses and temporary total disability benefits to the Plaintiff from September 26, 1996 until August 22, 1997. It terminated benefits on August 22, 1997 based on Dr. Aiken's declaration that she could return to work. The Plaintiff disagreed, but attempted to return. At that time, she spoke to the restaurant manager who indicated that he needed to talk to the owner because the Plaintiff expressed doubts that she could perform her duties as a waitress due to continued neck pain restricting her movements. The manager later informed her that she could not return.
The case proceeded to a hearing on March 28, 2001 and August 2, 2001. Following the hearing, the workers' compensation judge ordered the Defendant to pay supplemental earnings benefits (SEBs) to Plaintiff, pursuant to La.R.S. 23:1221(3), from August 22, 1997 through July 14, 1998, the date on which Dr. Aiken said that she reached maximum medical improvement. The workers' compensation judge further ordered the Defendant to pay all medical expenses, medical transportation expenses, and medication expenses, with a credit for workers' compensation benefits already paid. The workers' compensation judge found that the Defendant was arbitrary and capricious in failing to pay medical expenses timely and awarded the Plaintiff $2,000 in penalties and $2,000 in attorney's fees. The workers' compensation judge denied the Defendant's demand for forfeiture of benefits, finding that the Plaintiff did not willfully misrepresent the existence of prior accidents and neck injuries for the purpose of obtaining benefits.
On appeal, the Defendant contends that the workers' compensation judge erred in the award of SEBs, in ordering the payment of non-specific medical expenses, transportation costs and medication expenses, in the award of penalties and attorneys' fees, and in failing to find that the Plaintiff forfeited her right to further benefits because of willful misrepresentations.
The manifest error standard of review applies to factual findings in a workers' compensation case. Chaisson v. Cajun Bag & Supply Co., 97-1225, p. 13 (La.3/4/98), 708 So.2d 375, 380. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id. Where there are two permissible views of the evidence, a factfinder's choice of them can never be manifestly erroneous or clearly wrong. Chaisson, at p. 14, 708 So.2d at 381. Thus, if the factfinder's findings are reasonable in light of the record, the court *1041 of appeal may not reverse or modify the judgment. Id.
The Defendant first argues that the Plaintiff is not entitled to SEBs. It contends that the treating physician, Dr. Aiken, determined that the Plaintiff was able to return to work as a waitress in August of 1997. In conjunction with this medical opinion, the Defendant provided a vocational rehabilitation counselor to assist the Plaintiff, but the Plaintiff refused to cooperate, despite the counselor's efforts in November and December of 1997 and later in 1998. The Defendant contends that the Plaintiff's ability to work was not disputed by the testimony of Dr. John Olson, a neurologist, who treated the Plaintiff subsequent to Dr. Aiken, and Dr. William Berman, the Plaintiff's long-time chiropractor. Even so, the Defendant argues that greater weight should be given to Dr. Aiken, as the treating physician. The Defendant also argues that SEBs are not warranted because the Plaintiff can obtain work that pays 90% or more of her pre-injury wages.
La. R.S. 23:1221 provides in part:
(3) Supplemental earnings benefits.
(a) For injury resulting in the employee's inability to earn wages equal to ninety percent or more of wages at time of injury, supplemental earnings benefits equal to sixty-six and two-thirds percent of the difference between the average monthly wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience, such comparison to be made on a monthly basis. Average monthly wages shall be computed by multiplying his "wages" by fifty-two and then dividing the quotient by twelve.
(b) For purposes of Subparagraph (3)(a), of this Paragraph, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sums actually received by the employee, including, but not limited to, earnings from odd-lot employment, sheltered employment, and employment while working in any pain.
(c)(i) Notwithstanding the provisions of Subparagraph (b) of this Paragraph, for purposes of Subparagraph (a) of this Paragraph, if the employee is not engaged in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, or is earning wages less than the employee is able to earn, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sum the employee would have earned in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, which he was physically able to perform, and (1) which he was offered or tendered by the employer or any other employer, or (2) which is proven available to the employee in the employee's or employer's community or reasonable geographic region.
(ii) For purposes of Subsubparagraph (i) of this Subparagraph, if the employee establishes by clear and convincing evidence, unaided by any presumption of disability, that solely as a consequence of substantial pain, the employee cannot perform employment offered, tendered, or otherwise proven to be available to *1042 him, the employee shall be deemed incapable of performing such employment.
The Plaintiff had been a waitress for many years. When her temporary total disability benefits were calculated, it was determined that her average weekly wage was $139.50. The Defendant asserts that the Plaintiff's 1995 federal income tax return showed an income of $2,393 and that, in order to be entitled to SEBs, the Plaintiff must show that she cannot earn at least $125.55 per week, which is less than 90% or more of her average weekly wage.[1] According to the Defendant, the Plaintiff would only have to work 25 hours per week at a minimum wage job of $5.15 per hour in order to meet the 90% or more criteria to be ineligible for benefits. The Defendant argues that it tried to help her find a job that would be approved by Dr. Aiken, but she refused to cooperate with Mary Adair (Adair), the vocational counselor. In November and December of 1997, the Plaintiff told the counselor that she (the Plaintiff) could find her own job, fired her attorney, and informed Adair that she would not participate in her efforts until she found another attorney. The Plaintiff also informed Adair that she disagreed with Dr. Aiken's conclusion that she could work.
The evidence shows that the Plaintiff attempted to work in several different types of jobs, but was unable to continue. She attempted to work as a bartender, office worker, Mardi Gras float decorator, and Internet sale person, but refused Adair's assistance. However, the Plaintiff testified that she was still having severe pain that interfered with her ability to work during this time and was between attorneys in late 1997. She said that she was told not to talk to anyone until she obtained counsel. In addition, she did not feel capable of working, despite Dr. Aiken's conclusion. Because she disagreed with him and felt he was unresponsive to her complaints, the Plaintiff eventually sought the opinion of a neurologist, Dr. John Olson, in January of 1998, although she continued to be treated by Dr. Aiken until April of 2000. In addition, during the year that the workers' compensation judge ordered SEBs, the medical evidence shows that the fusion of one of the two discs had not become solid. Although Dr. Aiken felt that would not affect her ability to work, the Plaintiff continued to have pain.
The Plaintiff began seeing Dr. Olson in January of 1998 for unresolved pain in her neck that was radiating into her upper extremities. He treated her until March of 2001. Dr. Olson reviewed her records from Dr. Aiken, East Jefferson General Hospital (East Jefferson), and the MRI test taken after the surgery. He also performed neuro-diagnostic studies, with negative results. However, based on the MRIs taken in 1999 and 2000, he concluded that she had accelerated spinal arthritis with some impingement. He felt that these findings explain the Plaintiff's unrelieved pain after the surgery. He noted that the MRIs show spinal canal stenosis, or bone formation, that showed up in the November of 2000 MRI. Dr. Olson testified that the Plaintiff did not have that degree of bony growth prior to the surgery and it would not have resulted from a car accident in 2000 when she was struck from the rear. He explained that the development of stenosis is a slow process and concluded that it was consistent with the 1995 fall and 1996 surgery, because the time between the surgery and the MRI would fit the typical growth pattern of the *1043 condition. Dr. Olson thought that, although the actual physical fusion is good, she might have failed neck syndrome because there is a propensity for a double level cervical fusion to be associated with new disc herniations above or below the fusion site. Although, he did not see any new herniations on the MRIs, he observed significant bone proliferation at those levels. The radiologists' reports also noted the condition.
Dr. Aiken testified that, even if one of the fusions was not totally solid when he released the Plaintiff to return to work in August of 1996, that fact would not prevent her from working. He stated that her post-surgical progress was good and that there was enough bone growth of the graft that fused the discs to stabilize the neck. He could find no basis for her continued pain complaints. In none of his examinations following the surgery and throughout his treatment of her did she exhibit objective muscle spasms. Dr. Aiken further stated that during some of her flexion examinations, he noticed inconsistencies. She might claim that she could not move beyond a certain degree of flexion, yet could move normally in that direction while discussing other things with the doctor. Dr. Aiken also stated that some of her complaints, such as facial numbness, were clearly unrelated to the surgery or her neck. Nevertheless, he ordered neurological studies, but those were negative.
Dr. Aiken testified that both fusions were solid by July of 1998, at which time he concluded she had reached maximum medical improvement. Furthermore, he disagreed with Dr. Olson that the bony protrusions on the MRIs are significant. He said that the area of neck pain which she pointed out to him, after the surgery and over the course of his involvement with her case, was located at the top of the cervical spine, whereas the fusions were much lower. He asserted that she does not have a failed fusion, nor does she have any impingement.
The Plaintiff eventually asked Dr. Aiken to approve physical therapy for her at a local fitness gym, feeling that it would help her. Dr. Aiken complied with her request, but ordered it for general conditioning, rather than specifically for her neck and back pain complaints. In accordance with her instructions, she had been walking 1 to 2 miles per day.
During Dr. Aiken's treatment, he continued to believe that the Plaintiff was able to work an eight-hour day as a waitress or in similar employment. He approved the jobs submitted to him by Adair, which included cashier and other waitress type jobs. Dr. Aiken felt that a return to work would be good for her psychologically and that she should get on with her life. Dr. Aiken concluded that any current complaints are unrelated to the fall.
Dr. Berman testified that he had been treating the Plaintiff for many years, either for acute neck and back problems or as maintenance. Prior to the work related fall, he had treated the Plaintiff for neck and back complaints sustained in car accidents in 1987 and 1993. Dr. Berman stated that he treated the Plaintiff's neck pain aggressively until it was as good as it was going to get in 1988 and 1993, and noted that she would have residual pain that would wax and wane. Dr. Berman also said that the Plaintiff showed some arthritic changes before the 1995 fall, but that the acute condition from both accidents had resolved by 1995. Dr. Berman placed the Plaintiff on a maintenance program following those accidents. He testified that her symptoms following each of those accidents did not warrant a referral to an orthopedic doctor. However, after the work injury, after which he treated her *1044 with traction, spinal adjustments, and massage, Dr. Berman referred her to an orthopedic surgeon. Dr. Berman made the referral because she complained of tingling and numbness in her leg and hand. He saw her again for a short time after the surgery, and in January of 1998, she resumed maintenance adjustments. After the accident in 2000, Dr. Berman treated her aggressively until she reached pre-car-accident status then placed her back on maintenance. He felt that the 2000 car accident was minor. He agreed with Dr. Olson's conclusion from the MRI taken in November of 2000 that the Plaintiff developed advanced spinal stenosis at the surgical site, which he described as arthritis around the spinal cord causing the spinal canal to narrow in the neck area. He also felt that this was a gradual development caused by the 1995 fall and the subsequent 1996 surgery.
In relation to bouts of depression which she suffered from the pain of her injuries, the Plaintiff was tested and treated by a psychologist, Dr. Jerry McWilliams. Psychologist, Dr. Thomas Hannie, also examined her on one occasion.
The Plaintiff testified that she could not work regular hours, as required by most jobs that she was capable of performing. She stated that when she attempted to sit, stand, or carry items, she would have to rest frequently. In addition, her thinking ability suffered because of the pain and medications, which compromised her attempts to perform clerical or Internet sales work. The evidence further shows that the Plaintiff suffered from neck pain continuously from the time she stopped working, even after the surgery. She never stopped seeking relief for it. Although Dr. Aiken implied that the Plaintiff might be exaggerating, her other treating doctors found the complaints reasonable based on the medical tests. The Plaintiff had always been a hard worker, and had rarely been absent from work at Defendant's restaurant since she started in 1990. Thus, the evidence preponderates that she is not malingering. In addition, although Adair performed a market survey and found several full-time jobs that were available to the Plaintiff from July 1, 1997 to April 28, 1998, which were approved by Dr. Aiken, this survey was not presented by Adair until June of 1998.
The workers' compensation judge listened to the witnesses and viewed the evidence. She was convinced that the Plaintiff could probably perform some type of light work from August of 1997 until she reached maximum medical improvement in July of 1998. However, she did not find that the Plaintiff could earn 90% or more of her previous wages during that time. Reviewing the evidence as a whole, we find no manifest error in the workers' compensation judge's conclusion that the Plaintiff is entitled to SEBs from August of 1997 through July of 1998, in accordance with R.S. 23:1221.
Next, the Defendant contends that the judge erred in awarding all medical bills, transportation expenses, and prescription expenses. The Plaintiff requests payment of all of her medical expenses, including her treatment by Dr. Olson, medical expenses for various hospital visits and medical tests, Dr. Berman's bills for chiropractic treatments, mileage expenses related to her medical treatment, and prescriptions expenses.
The Defendant contends that it has paid all of the expenses which it owes. It argues that the expenses demanded by the Plaintiff were either not authorized by the Defendant or the Defendant was not informed of the expenses until shortly before trial. The Defendant further asserts that Dr. Berman was paid for a number of chiropractic treatments that were directly *1045 necessitated by the neck injury, but that any bills submitted by the Plaintiff here are not compensable because they are only for maintenance treatments, and/or due to an aggravation of her neck injury in a car collision in 2000. The Defendant also disputes the Plaintiff's right to mileage because she failed to submit those expenses in the proper form. The Defendant further contends that the Plaintiff's handwritten summaries of her out of pocket expenses that were accepted into evidence are inadmissible as either hearsay, or because they are not properly supported by documentation.
La.R.S. 23:1203 requires the Defendant to pay all necessary and reasonable medical expenses, including transportation expenses related to the medical treatment and prescription costs. Even when the medical expenses are not pre-approved, the Defendant must pay if the Plaintiff shows that they are reasonable and necessary. See: Curtis v. Wet Solutions, Inc., 98-789 (La.App. 3rd Cir.12/9/98), 722 So.2d 421, 431. Furthermore, R.S. 23:1121B provides:
The employee shall have the right to select one treating physician in any field or specialty. The employee shall have a right to the type of summary proceeding provided for in R.S. 23:1124(B), when denied his right to an initial physician of choice. After his initial choice the employee shall obtain prior consent from the employer or his workers' compensation carrier for a change of treating physician within that same field or specialty. The employee, however, is not required to obtain approval for change to a treating physician in another field or specialty.

In this case, the Plaintiff sought treatment from Dr. Olson because she was not happy with Dr. Aiken's response to her complaints. Dr. Olson is a neurologist and Dr. Aiken is an orthopedic surgeon. Because Dr. Olson is in another field from Dr. Aiken, prior approval for his treatment was not necessary. The Defendant is therefore, responsible for his bills. In addition, the Plaintiff showed that the expenses were necessary and reasonable. Dr. Olson and Dr. Berman recognized possible reasons for the Plaintiff's pain, the Plaintiff had been a hard worker from the time she was 14 years old and the evidence preponderates that she is not malingering. Thus, her resort to Dr. Olson was not unreasonable.
In regard to Dr. Berman, we find that the Defendant is not liable for those bills. Dr. Berman testified that he had been paid for the treatments which he provided to the Plaintiff after the injury and after the surgery. The Plaintiff's subsequent treatments were for maintenance, which the Plaintiff received prior to the fall and would have continued regardless of the work accident. Thus, the Defendant is not responsible for any outstanding chiropractic bills.
The Plaintiff produced evidence of other outstanding medical expenses. The Defendant contends that the evidence of these expenses are inadmissible as hearsay or because they lack documentation.
First, we find that the evidence is not inadmissible hearsay. La.R.S. 23:1317 provides in part:
The workers' compensation judge shall not be bound by technical rules of evidence or procedure other than as herein provided, but all findings of fact must be based upon competent evidence ... and all compensation payments provided for in this Chapter shall mean and be defined to be for only such injuries as are proven by competent evidence, or for which there are or have been objective conditions or symptoms proven, not *1046 within the physical or mental control of the injured employee himself. The workers' compensation judge shall decide the merits of the controversy as equitably, summarily, and simply as may be ...
In Chaisson, at p. 15, 708 So.2d at 381, the Louisiana Supreme Court discussed the admissibility of hearsay evidence in workers' compensation cases:
In other words, the hearing officer has the discretion to admit evidence that would otherwise be inadmissible under the Louisiana Code of Evidence. This more relaxed standard for the admissibility of evidence is the general rule in proceedings before administrative agencies. MCCORMICK ON EVIDENCE § 352 (4th ed.1992). The legislative requirement that a hearing officer's factual findings be based upon competent evidence is the safeguard that ensures that the factual findings are made on evidence that has some degree of reliability and trustworthiness, notwithstanding that the evidence might fall outside of the technical rules for admissibility. Therefore, when a reviewing court evaluates the factual findings of a hearing officer under the manifest error standard, it must determine whether the factual findings are reasonable and supported by competent evidence in the record. Although the Legislature has not defined "competent evidence," in order to give the relaxed evidentiary standard in LSA-RS 23:1317 effect, it must not be defined so narrowly as to mean only evidence that would fall within the parameters of the Louisiana Code of Evidence. If the hearing officer's factual findings are reasonably supported by competent evidence, then the reviewing court must affirm them.
The Court then held:
To give effect to the more relaxed evidentiary standards in LSA-RS 23:1317, we hold that the hearing officer has the discretion to admit hearsay evidence in worker's compensation proceedings. We further hold that such evidence can qualify as "competent evidence," provided that the evidence has some degree of reliability and trustworthiness and is of the type that reasonable persons would rely upon. This determination must be made on a case-by-case basis under the particular facts and circumstances. The reviewing court must evaluate the competency of the evidence under the manifest error standard.
Chaisson, at p. 19, 708 So.2d at 382.
The workers' compensation judge found the evidence to be reliable. We find no manifest error in this regard.
Second, we have reviewed the medical documentation and the out of pocket summaries produced by the Plaintiff. We find that the Plaintiff substantiated her claim to the bills.
The Plaintiff introduced bills for diagnostic tests and/or treatments at Lakeview Regional Hospital (Lakeview). The services were provided on July 16, 1996 for $2,213 and August 16, 1996 for $1,695.25. Her bills for Columbia Lakeview Regional Medical Center totaled $897.17. Those were all clearly related to her neck problem and were ordered by the doctors treating the Plaintiff prior to Dr. Aiken. In addition, the Defendant is obligated to pay the following: an emergency room visit to Lakeview on July 9, 1997 for $161.00, another emergency room visit to East Jefferson on July 13, 1997 that is clearly work related for $249.35, an overnight hospitalization that included cervical spine x-rays at Lakeview in March of 2000 in the amount of $338, spinal x-rays from Delta Radiology Limited taken on April *1047 16, 1997 for $32, and a laboratory bill on the same date for $150. The Defendant also owes for the costs of unpaid prescription medicines ordered by Dr. Olson, since we have found that his treatment was justified. Those bills are reflected in two Wal-Mart pharmacy computer printouts for the years 1998, 1999, and 2000 (for $197.94) and in 2001 for ($68.61), totaling $266.55.
The Plaintiff is also entitled to mileage costs at "the same rate per mile as established by the state of Louisiana for reimbursement of state employees for use of their personal vehicle on state business...." La.R.S. 23:1203D.
In reviewing the mileage summaries submitted by the Plaintiff, we find that the Plaintiff proved her expenses were related to the job injury by a preponderance of the evidence. Thus, she is entitled to reimbursement according to law. Those expenses are: Dr. Sinclair28 miles (7 visits × 4 miles); Dr. Logan98 miles (7 visits × 14 miles); therapy ordered by Dr. Sinclair90 miles (9 visits × 10 miles); Dr. Parr56 miles (4 visits × 14 miles); Dr. Aiken630 miles (9 visits × 70 miles); Dr. Fleming140 miles (2 visits × 70 miles); Dr. John Palopoli, a physiatrist recommended by Dr. Sinclair14 miles (1 visit × 14 miles); and East Jefferson280 miles; Dr. Berman6,480 miles (81 visits × 80 miles); Dr. Hannie75 miles (1 visit × 75 miles); and Dr. McWilliams504 miles (36 visits × 14 miles), four of which were for group therapy. Dr. Thomas Hannie and Dr. Jerry Lee McWilliams conducted psychological tests due to her depression from the injuries. We excluded the visit to the emergency room when the Plaintiff was diagnosed with conversion reaction.
The Plaintiff is also entitled to reimbursement for the costs she paid to retrieve a copy of her medical file from Dr. Aiken, $37.75, the cost of the back brace, $20, and the copying cost for her file from defense counsel, Richard Seelman, $33.50.
The Plaintiff lists toll fees as part of her expenses for 184 trips from her home in Covington, Louisiana on the north shore of Lake Pontchartrain to the south shore medical providers. The toll fee for crossing the causeway over Lake Pontchartrain is $1.50 each way, or $3. After reviewing the evidence, we find that the fees listed correlate to her medical visits. Thus, she is entitled to $276 (184 × $3). She is also entitled to $30 for two taxicab trips necessitated when she received shots from Dr. Parr that prevented her from driving. In addition, the Defendant is obligated to pay for physical therapy at Pelican Health Club (Pelican) that was approved by Dr. Aiken. In this regard, she paid $50.88 per month. Neither the Plaintiff's summary, nor her testimony, relates the number of months that she required the therapy. However, Dr. Aiken's testimony reflects that she incurred these expenses for at least five months. Thus, we find that she is entitled to reimbursement of her club dues in the amount of $254.40. Because the evidence does not reflect her mileage to and from the club, we find that she is not entitled to reimbursement for mileage.
The Defendant next asserts that it was not arbitrary and capricious in failing to pay medical bills.[2] The evidence shows *1048 that the Defendant failed to pay within 60 days two bills from East Jefferson that were undisputedly related to the Plaintiff's surgery. Karen Young (Young), the claims adjuster, was not able to explain clearly why those outstanding balances were not paid other than it had something to do with their procedures. In fact, she admitted that the surgical bill was paid four months after the surgery in the amount of $6,414.51. Yet, she claimed in a letter to the Plaintiff's counsel that she paid over $8,878.21. She could only surmise that the hospital successfully appealed for payment of some of the difference. She testified that only $1,131.97, probably in accordance with the fee schedule, was finally paid to the hospital in January of 1998. Further-more, it appeared that the hospital was billing the Plaintiff for the amount of the difference, although the hospital was not supposed to, and the Plaintiff said that she notified the Defendant's counsel about the bills. Another bill for $240.51 from the hospital was not paid until July 31, 1997.
Young defended her failure to pay other medical bills that the Plaintiff presented, contending that she did not know about those until shortly before the hearing. Nevertheless, she disregarded them because they did not appear to be related to Dr. Aiken's treatment or referrals and did not have the approval of the claims adjuster or Dr. Aiken. Yet, a closer investigation would have disclosed that both Dr. Olson and Dr. Berman found merit to the Plaintiff's complaints and that at least some of the unapproved bills were related to the work injury. We were able to do so after reviewing the bills, as we stated in our discussion above.
Young testified that she did not pay mileage because she did not receive mileage requests until May of 2001, and then the information was not on the proper form that is sent to each claimant with the initial packet following a claim. She explained that the mileage list presented by the Plaintiff lacked dates and each visit was not itemized. However, Young did not notify the Plaintiff prior to trial that the mileage report was not in acceptable form and did not ask her to reconstruct it. Furthermore, this Court was able to reconstruct the payable portions of the mileage. Thus, we find no reason for the Defendant's failure to attempt and ascertain the payable mileage amounts.
We find the failure to pay any of the submitted prescription bills unjustified as well. Young excused her failure to pay them because the Plaintiff did not use a prescription card given to her sometime in 1995 at the inception of the claim. However, the Plaintiff provided the Defendant and the trial court with two detailed computer printouts from Wal-Mart pharmacy listing the drug, the cost, and the doctor ordering the medication. It was not difficult for this Court to determine which drugs had been ordered by the doctors treating the Plaintiff for the work related injury. Thus, we find no reason for the Defendant's failure to attempt and arrive at the payable prescription amounts.
The Defendant also argues that Plaintiff was in an automobile accident in 2000 and that she complained of neck pain from that incident. Thus, it concludes that the treatments she received after that date are not related to the work injury. However, Dr. Berman and Dr. Olson concluded that the effect on the Plaintiff was minor, and they related her on-going pain to the work-injury and the stenosis from the surgery.
Based on the evidence, we find no manifest error in the judge's finding that the *1049 Defendant was arbitrary and capricious in failing to pay medical expenses timely, and in the award of penalties.
The Defendant also asserts that, if found liable for Dr. Olson and Dr. Berman's bills, its liability is limited to $750 pursuant to La.R.S. 23:1142A.
La.R.S. 23:1142A requires the mutual consent of the payor (the employer or insurer) and the claimant for nonemergency treatment over $750. However, if the refusal to pay such expenses is found by the court to be arbitrary and capricious, R.S. 23:1142D provides that the court shall impose attorney's fees and order the payment of the medical expenses by the payor. The workers' compensation judge found that the Defendant was arbitrary and capricious in failing to consent and/or to pay medical expenses. That includes Dr. Olson's expenses. Because we have found no manifest error in this conclusion, R.S. 23:1142A does not limit the amount of the medical expenses incurred by the Plaintiff for Dr. Olson's treatment.
The Defendant contends that the workers' compensation judge erred in awarding attorneys' fees because the Plaintiff failed to present evidence of her attorney's time. However, we find that the attorneys' fees awarded are not unreasonable, given the nature of the case, the degree of skill and ability exercised by the attorney, the amount of the claim, and the amount recovered for the claimant. See: Langley v. Petro Star Corp. of La, 01-0198 (La.6/29/01), 792 So.2d 721, 728.
Finally, the Defendant contends that the workers' compensation judge erred in failing to find the Plaintiff forfeited her right to compensation by denying in her deposition that she injured her neck in two previous auto accidents and by neglecting to inform Dr. Aiken and Dr. Olson of these facts. The workers' compensation judge concluded that her omissions were not willful misrepresentation designed to secure workers' compensation payments.
La.R.S. 23:1208 states in part:
A. It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representation.
* * *
E. Any employee violating this Section shall, upon determination by workers' compensation judge, forfeit any right to compensation benefits under this Chapter.
In Parker v. ADM Milling Co, 01-649, p. 7-8 (La.App. 5th Cir.11/27/01), 804 So.2d 120, 126 we stated:
The only requirements for forfeiture under Section 1208 are that (1) there is a false statement or representation, (2) it is willfully made, and (3) it is made for the purpose of obtaining or defeating any benefit or payment. The relationship between the false statement and the pending claim will be probative in determining whether the statement was made willfully for the purpose of obtaining benefits. Because § 1208 is penal in nature, it must be strictly construed, both in its substantive ambit and in its penalty provisions. False statements that are inadvertent or inconsequential will not result in forfeiture.
The issue of whether an employee has forfeited her right to workers' compensation benefits is a factual question that should not be disturbed on appeal absent manifest error. Parker, 804 So.2d at 126. The Plaintiff explained her omission. She stated that she did not remember the other accidents when she was questioned *1050 and/or did not consider them significant or related to her injury in the work related fall. The workers' compensation judge determined that the Plaintiff did not willfully withhold the information for the purpose of obtaining benefits. We find no manifest error in the conclusion and in the workers' compensation judge's finding that the Plaintiff did not forfeit her right to benefits.
Accordingly, the judgment is hereby affirmed in part and amended in part to reflect the specific payments owed by the Defendant as set forth in this opinion.
AMENDED IN PART AND AFFIRMED AS AMENDED.
NOTES
[1] As calculated by the Defendant: $139.50 × 90% =$125.55, or $125.55 × 52 weeks=$544.05 per month.
[2] A stipulation was made following Karen Young's testimony that if the Defendant's counsel was called to testify, he would state that he did not receive any requests for reimbursement of out of pocket expenses or to pay any outstanding medical bills that she might have received. Furthermore, it was stipulated that if the Plaintiff testified again, she would state that she sent a letter to defense counsel, introduced into evidence with a return receipt, to the effect that she sent him that notice.